# In the
# United States Court of Appeals
## For the Seventh Circuit

_____

No. 03-2669

ERIC JOELNER, FISH, INC. d/b/a XXXTREME
ENTERTAINMENT, FREE SPEECH, INC.,
and FIRST AMENDMENT, INC.,

*Plaintiffs-Appellants,*

v.

VILLAGE OF WASHINGTON PARK, ILLINOIS,

*Defendant-Appellee.*

_____

Appeal from the United States District Court
for the Southern District of Illinois.
No. 03 C 325—**G. Patrick Murphy**, *Chief Judge.*

_____

ARGUED NOVEMBER 7, 2003—DECIDED AUGUST 4, 2004

_____

Before COFFEY, RIPPLE, and KANNE, *Circuit Judges.*

KANNE, *Circuit Judge.*

## I. Background

### A. The Parties

Eric Joelner, a resident of the Village of Washington
Park, Illinois, is president and sole shareholder of Fish, Inc.

d/b/a XXXtreme Entertainment, Free Speech, Inc., and First Amendment, Inc. (collectively, "Plaintiffs" or "Joelner"). All of these entities conduct, or seek to conduct, adult entertainment business within the corporate limits of Washington Park. Joelner, through Fish, Inc., has owned and operated an adult video and bookstore located at 2226 Kingshighway since at least 1995.[1]

In an effort to balance Washington Park's revenue needs and its desire to protect its citizens from what ostensibly it views as the negative effects of adult entertainment businesses, the municipality has enacted ordinances, which limit the number of adult entertainment outlets within its corporate limits, including both "bookstores" and "cabarets," *see infra* Part I.B., and impose license fees for such establishments. However, with a population of only 5,300 covering 2.5 square miles at the confluence of two interstate highways leading into St. Louis, Missouri, adult entertainment has been *the* industry of Washington Park. As of May 2003, there were four licensed, one unlicensed, and two newly licensed adult cabarets. Each licensed cabaret generates around $100,000 annually in licensing and other fees for the Village. And because the population of Washington Park decreased by more than 2,000 residents between 1990 and 2000, with a corresponding loss of about $300,000 a year in state funding, the income which the adult entertainment industry generates for the Village is critical. John McCormick, *Cash-strapped Town Relies on Strip Clubs to Pay Bills*, Chi. Trib., Apr. 29, 2003, at A1. (R. 1, Ex. 11.)

---

[1] Joelner claims to have been doing business at the 2226 Kingshighway location since 1990 or 1991. But on the record, we can know affirmatively only that Joelner has been licensed to operate such a business since 1995.

**B. The Ordinances**

Ordinance 069-99, adopted by the Village Board of Trustees on September 7, 1999, defined "adult entertainment" as anything "featuring acts, performances, videos, and/or movies, involving nudity, or partial nudity, but within the permitted community standards of the Village of Washington Park . . . ." It limited the number of such establishments to four, imposed an annual license fee of $3000, prohibited the sale or other transfer of licenses, set hours of operation, and included a severability clause.[2]

Then, four months later on January 11, 2000, Ordinance 01-00, although making no express reference to the prior ordinance, increased the annual licensing fee tenfold to $30,000. The stated goal of the increase was to protect the "public health, safety, and welfare" and to defray the increase in police, fire, and other costs associated with adult entertainment establishments.

Ordinance 01-22, adopted two years later on November 6, 2002, differentiates between "adult entertainment" establishments.[3] It defines "adult bookstores" as "[a]ny business which sells what is commonly known as adult entertainment books, magazines, other reading materials, movies, novelties, or paraphernalia" and "adult cabarets" as

---

[2]  All ordinances referred to herein are included in the appendix.

[3]  Problematically, neither Ordinance 01-00 nor Ordinance 01-22 explicitly refer to the relevant prior ordinances. But since each of these ordinances includes the word "amending" in its title, we are left to presume that, to the extent that the later ordinances conflict with prior ordinances, the prior ordinances no longer have effect. In addition, Ordinance 01-22 almost entirely subsumes the original ordinance, No. 069-99. However, because Ordinance 01-22 refers repeatedly to "adult entertainment," but nowhere defines it, we also presume that the definition of "adult entertainment" proffered in Ordinance 069-99 still has effect.

"[a]ny business with adult entertainment which includes live persons performing adult entertainment and which includes nudity." The annual licensing fees were altered as well: $10,000 for an adult bookstore, and $30,000 for a cabaret ($30,000 was the annual fee for either type of adult business under Ordinance 01-00). A permissible quarterly fee payment schedule was established in section 4, and the following provisions from Ordinance 069-99 were preserved in their entirety, although renumbered: the numerical "[l]imitation and [p]urpose" (now as section 5), the license transfer prohibition (section 6), hours of operation (section 7), and the severability provision (section 8).

### C. Joelner's Clashes With the Village

In January of 2003, the first in a series of disagreements over these ordinances began between Joelner and the Village. Joelner objected to the "increase" in annual licensing fees to $10,000, established in November of 2002 through Ordinance 01-22, for his existing bookstore at 2226 Kingshighway. Apparently, notwithstanding both Ordinances 069-99 and 01-00 which had, prior to Ordinance 01-22, set license fees for adult bookstores at $3000 and $30,000 respectively, Joelner had only been paying $100 per year to operate his business, without any documented objection. But in a letter dated December 23, 2002, the Village informed him of the "new" annual adult bookstore fee and requested that he make a first-quarter payment of $2500. On or around January 24, 2003 Joelner did so, but also remitted in the same check an additional $7500 first-quarter payment for an adult cabaret license.

The Village returned the $10,000 check to Joelner on February 20, informed him that his existing business was licensed only as a bookstore, not as a cabaret, and requested that Joelner forward his first-quarter bookstore fee as soon as possible. However, he made no further payment.

Notwithstanding this dispute with the Village over the fee for his bookstore's annual license, Joelner, through various

corporate entities, attempted to obtain three new adult entertainment licenses for properties located at 2226 Kingshighway, 2215-2221 Kingshighway, and 5900-6000 Bunkum Road.[4] At the April 15, 2003 Village Board of Trustees meeting, Joelner, as Fish, Inc., sought a license to expand his current bookstore business at 2226 Kingshighway to include cabaret entertainment, and, as First Amendment, Inc., sought a license to open a new combination cabaret and bookstore at 2215-2221 Kingshighway. As Joelner's requests were the final item on the Board's agenda, before any discussion or mention of his license applications, Ordinance 01-27 was adopted, increasing the number of adult businesses allowed in Washington Park from four to six.[5]

After the Board approved the ordinance, it then immediately granted the two newly available licenses—but not to Joelner. One license was awarded to a former village police chief's son, a convicted felon, whose application did not ap-

---

[4] We cannot discern whether Joelner, personally or through his various corporate entities, had an ownership interest in the properties located at 2226 Kingshighway, 2215-2221 Kingshighway, and 5900-6000 Bunkum Road sufficient to meet the standing requirement. *See also* R. 2, Ex. 10, pp. 16-17 (transcript of Village Board meeting on April 15, 2003 where questions of ownership were raised). It appears likely that Joelner at least has standing with respect to the 2226 Kingshighway location as he has been doing business there since 1995, but given that the resolution of this question is not central to the outcome here, we cannot and do not now make even a preliminary determination regarding standing.

[5] Ordinance 01-27 specifically states in its title that it "Amend[s] the Village of Washington Park, Illinois Ordinance No. 01-22, Section 5." Hence, we presume that the other sections of Ordinance 01-22 (and, by implication, section 3 of Ordinance 069-99, *see supra* note 3) remain in full effect. Ordinance 01-27 can be found in the appendix.

pear to be on the agenda, and the other to the owner of a trucking firm in the Village, whose application was on the agenda, immediately preceding Joelner's.

The Board then temporarily denied Joelner's two applications, accused Joelner of having past-due license fees for his currently operating bookstore (whether the Board was concerned with only the November 2002 fee increase or other arrearages is unclear), discussed revocation of Joelner's bookstore license, and finally voted to hold a hearing at a later time about the 2226 Kingshighway business.

Before the Village Board next convened, Joelner reached an informal agreement with the Village whereby he agreed to postpone the filing of any lawsuit against the Village until after June 1, in exchange for the Village's assurances that they would not seek to terminate his bookstore license during that same time. The Village continued to urge Joelner to "pay his delinquent adult bookstore fees."

Then at the next meeting on May 6, the Board briefly discussed the status of Joelner's 2226 Kingshighway business, and was informed by its attorney that negotiations were proceeding between Joelner and the Village regarding the disputed arrearages. The Board took no further action regarding the 2226 Kingshighway business, and then later, during that same meeting, considered Joelner's third license application seeking to open a combination adult cabaret and bookstore at 5900-6000 Bunkum Road, as Free Speech, Inc. Based upon the alleged arrearages and the Board's claimed desire to avoid an over-saturation of adult businesses at that particular location (another adult entertainment outlet was licensed for a property immediately adjacent to that proposed by Joelner), the Board denied this third and final application.

After negotiations regarding the 2226 Kingshighway business apparently failed, Joelner filed suit against the

Village on May 23, 2003 in the Southern District of Illinois and asserted that the ordinances at issue were unconstitutional restrictions of protected speech both on their face and, with respect to the numerical restriction, as applied. Joelner also filed a preliminary injunction motion to prevent enforcement of the ordinances, and to force the Village to grant the three requested licenses. Again Joelner and the Village reached an informal agreement, whereby Joelner was allowed to continue to operate his existing bookstore pending a ruling on the preliminary injunction.

After a hearing on June 12, 2003, the district court granted in part and denied in part Joelner's request for a preliminary injunction. The court found the ordinances constitutional and refused to prohibit the Village from enforcing the ordinances with respect to both the numerical limitations and licensing fees imposed on adult entertainment outlets. It also refused to require the Village to issue any cabaret licenses to Joelner for the new locations. However, the court did order the Village to allow Joelner to continue to operate his current bookstore business at 2226 Kingshighway, and also to consider in a new hearing Joelner's application for a cabaret license for that same location, so long as he paid any arrearages and the newly approved November 2002 fees. This appeal followed.

## II. Analysis

For the reasons set forth below, we find that the district court correctly refused to preliminarily enjoin the Village from enforcing the two ordinances, and we further find that the court appropriately granted the preliminary injunction requiring the Village to allow Joelner to continue to operate his bookstore business at 2226 Kingshighway. However, we also determine that the district court erred in granting the injunction requiring Joelner to pay the disputed fees and/or arrearages in order to continue operating his bookstore and

requiring the Village to conduct a new hearing to consider Joelner's cabaret license application for the 2226 Kingshighway location.

Under the First Amendment, "Congress shall make no law . . . abridging the freedom of speech . . . ." U.S. Const. amend. I. The Free Speech Clause applies to the states by operation of the Fourteenth Amendment's due process clause. *E.g.*, *Ben's Bar, Inc. v. Vill. of Somerset*, 316 F.3d 702, 707 (7th Cir. 2003) (citations omitted).

In order to obtain a preliminary injunction, the moving party must show that: (1) they are reasonably likely to succeed on the merits; (2) no adequate remedy at law exists; (3) they will suffer irreparable harm which, absent injunctive relief, outweighs the irreparable harm the respondent will suffer if the injunction is granted; and (4) the injunction will not harm the public interest. *See Erickson v. Trinity Theatre, Inc.*, 13 F.3d 1061, 1067 (7th Cir. 1994). If the movant can meet this threshold burden, then the inquiry becomes a "sliding scale" analysis where these factors are weighed against one another. *See AM General Corp. v. DaimlerChrysler Corp.*, 311 F.3d 796, 804 (7th Cir. 2002); *Connection Distrib. Co. v. Reno*, 154 F.3d 281, 288 (6th Cir. 1998); *Erickson*, 13 F.3d at 1067; *see also Nat'l People's Action v. Vill. of Wilmette*, 914 F.2d 1008, 1110-11 (7th Cir. 1990). In reviewing a district court's denial or grant of a preliminary injunction, we examine legal conclusions de novo, findings of fact for clear error, and the balancing of the previously noted factors for abuse of discretion. *Anderson v. U.S.F. Logistics (IMC), Inc.*, 274 F.3d 470, 474 (7th Cir. 2001).

When a party seeks a preliminary injunction on the basis of a potential First Amendment violation, the likelihood of success on the merits will often be the determinative factor. *Connection Distrib. Co.*, 154 F.3d at 288, *cited in ACLU of Ken. v. McCreary*, 354 F.3d 438, 445 (6th Cir. 2003); *see, e.g.*, *Brownsburg Area Patrons Affecting Change v. Baldwin*,

137 F.3d 503, 507 (7th Cir. 1998). "The loss of First Amend-ment freedoms, for even minimal periods of time, unques-tionably constitutes irreparable injury," *Elrod v. Burns*, 427 U.S. 347, 373 (1976), and money damages are therefore inadequate, *Nat'l People's Action*, 914 F.2d at 1013. Con-comitantly, there can be no irreparable harm to a munici-pality when it is prevented from enforcing an unconstitu-tional statute because " 'it is always in the public interest to protect First Amendment liberties.' " *Connection Distrib. Co.*, 154 F.3d at 288 (citing *G & V Lounge, Inc. v. Mich. Liquor Control Comm'n*, 23 F.3d 1071, 1079 (6th Cir. 1994)); *cf. Homans v. Albuquerque*, 264 F.3d 1240, 1244 (10th Cir. 2001) ("[W]e believe that the public interest is better served by . . . protecting [ ] core First Amendment right[s]"), *cited in Newsom v. Albemarle County Sch. Bd.*, 354 F.3d 249, 261 (4th Cir. 2003) ("Surely, upholding constitutional rights serves the public interest.").

However, it is sometimes necessary to inquire beyond the merits, *see MacDonald v. Chicago Park Dist.*, 132 F.3d 355, 358 (7th Cir. 1997) (per curiam), particularly when the challenged statute regulates the adult entertainment industry. "[E]ven though we recognize that the First Amendment will not tolerate the total suppression of erotic materials that have some arguably artistic value, it is manifest that society's interest in protecting this type of expression is of a wholly different, *and lesser*, magnitude than the interest in untrammeled political debate . . . ." *City of Erie v. Pap's A.M.*, 529 U.S. 277, 294 (2000) (emphasis added) (internal quotations omitted). Furthermore, the purpose of adult entertainment regulations often is to minimize the deleterious secondary effects that may ac-company adult entertainment businesses (e.g., increased crime rates, decreased property values). *See City of Renton v. Playtime Theatres, Inc.*, 475 U.S. 41, 47 (1986). Indeed, Washington Park proffers that very rationale here. There-fore, Joelner's request for a preliminary injunction based

upon his claim that the Village's adult entertainment ordinances are unconstitutional implicates two conflicting public interests—protecting First Amendment liberties and minimizing any harmful secondary effects of such businesses. *Cf. Pap's A.M.*, 529 U.S. at 294.

We note that this interlocutory appeal of a preliminary injunction (granted in part and denied in part) cannot result in a conclusive determination of the constitutional merits of Joelner's claims. *See, e.g., MacDonald*, 132 F.3d at 357-58 (citing *Ayres v. City of Chicago*, 125 F.3d 1010, 1013 (7th Cir. 1997)). The appellate record contains only three or four items that contribute substantially to the factual background of this case: Joelner's complaint and request for a preliminary injunction, the Village's motion in opposition to the preliminary injunction, and the preliminary injunction hearing transcript and evidence. As a result, numerous critical factual ambiguities plague the record, including, but not limited to: what inquiries were conducted by the Village and what findings were made to support its adult entertainment ordinances; exactly how many adult establishments are currently operating—with or without licenses—in Washington Park; whether subsequent ordinances abrogated prior ordinances; the total amount of licensing fee arrearages allegedly owed by Joelner and the basis for that number; which license applications were and were not on the April 15 agenda; why applications were considered in a particular order by the Board on April 15; and the justification(s) for the denial of Joelner's applications, other than the alleged arrearages. Moreover, the question of standing remains, *see supra* note 4. All of these issues may be more fully explored when the district court, upon remand, takes up Joelner's request for a permanent injunction and declaratory relief.

Because a definitive determination on the merits is not now possible, we will consider the relative strength of Joelner's constitutional claims based on the skimpy appel-

late record and then balance the possible negative impacts of the grant or denial of a preliminary injunction on (1) Joelner's business(es), (2) the Village, and (3) the aforementioned two-fold public interest.

## A.  Reasonable Likelihood of Success on the Merits

Here we must decide, in the context of a preliminary injunction, whether a municipality can constitutionally limit the number of adult entertainment venues and impose annual licensing fees for such businesses. Specifically, Joelner posits that both the numerical restriction and licensing fees are facially unconstitutional, and that the numerical restriction was unconstitutionally applied. With respect to the facial challenges, it is an uphill battle because, absent overbreadth and/or vagueness challenges, he can only prevail if he demonstrates " 'that no set of circumstances exist under which the [regulation] would be valid.' " *Ben's Bar*, 316 F.3d at 708 n.11 (quoting *United States v. Salerno*, 481 U.S. 739, 745 (1987) (brackets in original) and citing *Horton v. City of St. Augustine*, 272 F.3d 1318, 1331 (11th Cir. 2001)). *See also Thomas v. Chicago Park Dist.*, 227 F.3d 921, 923 (7th Cir. 2000), *aff'd on other grounds*, 534 U.S. 316 (2002). We recently conducted an exhaustive review of First Amendment Supreme Court jurisprudence in *Ben's Bar, Inc. v. Village of Somerset*, 316 F.3d 702, 708-722 (7th Cir. 2003), and need not repeat that analysis here.

### 1.  The Numerical Restriction

#### a.  Facial Challenge

The primary thrust of Joelner's facial challenge to the numerical restriction is his assertion that because the ordinance applies only to "adult entertainment" outlets, it is a content-based restriction of erotic expression, subject to strict scrutiny, and cannot pass constitutional muster. But

"content-neutrality" is a concept easily and oft confused. *Cf. City of Los Angeles v. Alameda Books, Inc.*, 535 U.S. 444-48 (2002) (Kennedy, J. concurring) (discussing the difficulties of the "content-neutrality" inquiry); *Schultz v. City of Cumberland*, 228 F.3d 831, 845 (7th Cir. 2000) ("[T]he fact that the Ordinance definition is content-based on its face does not necessarily dictate that the Ordinance is analyzed as content-based and subject to strict scrutiny.").

Ordinance 01-27 is clearly directed only at "adult entertainment." Regulations which directly circumscribe a certain category of speech are subject to strict scrutiny and are likely to be constitutionally impermissible. *See, e.g., R.A.V. v. City of St. Paul*, 505 U.S. 377, 382 (1992); *Renton*, 475 U.S. at 47; *Stromberg v. California*, 283 U.S. 359, 368-69 (1931). But the First Amendment tolerates governmental interference with general categories of expressive *conduct*, as opposed to *actual speech. Schultz*, 228 F.3d at 841. Very generally, whether conduct regulations will be subject to intermediate or strict scrutiny most often actually hinges upon the regulation's intended purpose, rather than some strained interpretation of content-neutrality. *See Ben's Bar*, 316 F.3d at 723; *Schultz*, 228 F.3d at 845 ("[C]ourts often called [regulations] content-neutral without explaining that [they] are in fact content-based and only analyzed as content-neutral when certain preconditions are met.").

There are two distinct, yet overlapping, lines of Supreme Court jurisprudence addressing the degree of First Amendment protection afforded to adult entertainment, a particular type of expressive conduct. *Ben's Bar*, 316 F.3d at 712-13. One group of cases addresses public indecency regulations. *See Barnes v. Glen Theatre, Inc.*, 501 U.S. 560 (1991); *City of Erie v. Pap's A.M.*, 529 U.S. 277 (2000). The other considers adult entertainment zoning ordinances. *See Young v. Am. Mini Theatres, Inc.*, 427 U.S. 50 (1976) ("*AMT*"; *City of Renton v. Playtime Theatres, Inc.*, 475 U.S. 41 (1986); *City of Los Angeles v. Alameda Books, Inc.*, 535 U.S.

425 (2002). However, the analytical framework underpinning both strains of jurisprudence is rooted in *United States v. O'Brien*, 391 U.S. 367, 376-82 (1968). *Ben's Bar*, 316 F.3d at 714. Consequently, the Supreme Court has held that the distinctions between the test used to assess the constitutionality of public indecency statutes, *see Pap's A.M.*, 529 U.S. at 289, and that used to evaluate adult entertainment zoning ordinances, *see Renton*, 475 U.S. at 46-47, are irrelevant. 316 F.3d at 714.

Ordinance 01-27 cannot neatly be categorized as either an indecency regulation or zoning ordinance, similar to the statute at issue in *Ben's Bar*, 316 F.3d at 722-28. Thus, we will analyze Ordinance 01-27 just as we analyzed the *Ben's Bar* statute—by using the "road map" provided in *44 Liquormart, Inc. v. Rhode Island*, 517 U.S. 484 (1996). 316 F.3d at 722. A restriction placed upon the number of adult entertainment outlets is constitutional if:

> (1) the State is regulating pursuant to a legitimate governmental power; (2) the regulation does not completely prohibit adult entertainment; (3) the regulation is aimed not at the suppression of expression, but rather at combating the negative secondary effects caused by adult entertainment establishments; and (4) the regulation is designed to serve a substantial government interest, [is] narrowly tailored, and reasonable alternative avenues of communication remain available . . . .

*Id.* at 722 (citations omitted). Step four encapsulates the intermediate standard of scrutiny applicable in First Amendment challenges to adult entertainment regulations. *See, e.g., Renton*, 475 U.S. at 47; *AMT*, 427 U.S. at 61. However, if a regulation fails to satisfy either steps two or three, strict scrutiny applies and, in order to be constitutional, the statute must be "necessary to serve a compelling state interest and be narrowly drawn to achieve that end."

*Schultz*, 228 F.3d at 848 (citing *Simon & Schuster, Inc. v. Members of the N.Y. State Crime Victims Bd.*, 502 U.S. 105 (1991)).

First, Ordinance 01-27 is an exercise of the Village's general police power because it is purportedly justified as an effort to protect the public's health, welfare, and safety. *See*, *e.g.*, *Ben's Bar*, 316 F.3d at 722-23. Therefore, the Village is regulating pursuant to a legitimate government power and prong one is met.

Second, Ordinance 01-27 is plainly not a complete prohibition of adult entertainment. It explicitly allows six venues for such expression. Because no additional adult cabarets or bookstores can be licensed after the maximum number of licenses are issued, Joelner asserts that the Ordinance therefore operates as a "complete ban." *See*, *e.g.*, *Alameda Books*, 535 U.S. at 443 (mentioning that the Ninth Circuit had rejected a similar argument advanced below by the adult bookstore/arcade owner, but not reaching the issue). We find this characterization unpersuasive. Because adult entertainment venues are not prohibited entirely in Washington Park, it is more appropriate to view the ordinance as a limitation, rather than a ban. Joelner is unable to point us to any case which says otherwise. Thus, as Ordinance 01-27 does not eliminate erotic expression in Washington Park, prong two is met.

The third prong of the analysis, which considers whether the regulation is aimed at reducing the negative effects of adult speech and not the suppression of speech, when coupled with the second, concerns the level of scrutiny that must be applied to Ordinance 01-27. *Ben's Bar*, 316 F.3d at 723. In *Ben's Bar*, although we concluded that the statute was "content-based," we nonetheless applied intermediate scrutiny. *Id.* at 724. The focus was solely upon the municipality's purpose in enacting the statute.

If an ordinance was enacted to restrict certain viewpoints or modes of expression, *see Schultz*, 228 F.3d at 844-47, it is

subject to strict scrutiny and is presumptively invalid. But if an ordinance is a "time, place, and manner" restriction, enacted "predominant[ly]" to address the negative secondary effects caused by such expression and not to suppress the content of erotic speech, it is subject to intermediate scrutiny.[6] *Id.* at 841-42.

The "content-neutrality" inquiry is therefore subsumed by the inquiry into a municipality's purpose in enacting the regulation. *See* 316 F.3d at 724 (citing *Alameda Books*, 535 U.S. at 432-39 (plurality opinion); *id.* at 448-49 (Kennedy, J. concurring); *Pap's A.M.*, 529 U.S. at 294-96 (plurality opinion); and *id.* at 310 (Souter, J., concurring in part and dissenting in part)). In evaluating a municipality's underlying regulatory motivations, we may consider a " 'wide variety of materials including, but not limited to, the text of the regulation or ordinance, any preamble or express legislative findings associated with it, and studies and information of which legislators were clearly aware.' " 316 F.3d at 723 n.28 (quoting *Ranch House, Inc. v. Amerson*, 238 F.3d 1273, 1280 (11th Cir. 2001)). And while a municipality need not conduct new studies or produce evidence independ-

---

[6] "[An ordinance restricting factories to areas far from residential neighborhoods] might, like a speech restriction, be 'content based.' It might, for example, single out slaughterhouses for specific zoning treatment . . . . Without knowing more, however, one would hardly presume that because the ordinance is specific to that business, the city seeks to discriminate against it . . . . One would presume, rather, that the ordinance targets not the business but its particular noxious side effects. *The business might well be the city's most valued enterprise; nevertheless, because of the [negative side effects] it causes, it may warrant special zoning treatment. This sort of singling out is not impermissible content discrimination; it is sensible urban planning.*" *Alameda Books*, 535 U.S. at 446 (emphasis added) (citation omitted).

ent of that already generated by other cities, *id.* at 716-17 (citing *Renton*, 475 U.S. at 51-52), there still must be some reasonably relevant evidentiary basis for a municipality's action.[7]

In the instant case, Ordinance 01-27 limits the number of "places" providing adult entertainment at any one "time" to six, but includes no guidelines to restrict the mode by which erotic messages are conveyed. *See, e.g., Schultz*, 228 F.3d at 847 (holding unconstitutional a statute which "restrict[ed] the particular movements and gestures of the erotic dancer" and thereby "depriv[ed] the performer of a repertoire of expressive elements with which to craft an erotic, sensual performance.") Hence, Ordinance 01-27 is a type of time, place, and manner restriction.

The preamble to Ordinance 01-27 states that it was enacted "[i]n order to promote the public interest in the preservation of public health, safety and welfare . . . ." In addition, the ordinances which were adopted prior to No. 01-27, Nos. 069-99 and 01-22, both cite "public health, safety, and welfare"

---

[7] In *Ben's Bar*, we discussed the slight variations between the views of Justice Kennedy and the plurality in *Alameda Books* regarding the correct evidentiary burden which must be met by a municipality in the third prong of the analysis. 316 F.3d at 720-22. As Justice Kennedy's concurrence is the narrowest opinion joining the judgment of the Court in *Alameda Books*, it controls. *Marks v. United States*, 430 U.S. 188, 193 (1977). Hence, although "very little evidence is required," *Alameda Books*, 535 U.S. at 451 (Kennedy, J. concurring), the municipality's inference that the ordinance "may reduce the costs of secondary effects without substantially reducing speech," *id.* at 450, must appear reasonable. Given the particular nature of this appeal, the distinction here is inconsequential, but we note that it may not be upon remand for a full adjudication.

as the basis for the restriction.[8] But it is not enough for the Village to indicate that the secondary effects of adult entertainment were *one* concern underlying its enactment of Ordinance 01-27, such effects must be the "predominant concerns." *Ben's Bar*, 316 F.3d at 723.

The record does not contain any legislative findings or any indication that the Board considered studies or other information before enacting Ordinance 01-27, or its precursor ordinances. Without this information, we cannot now determine if intermediate scrutiny applies. But we also note that when the matter is fully considered upon remand, if the Village is unable to point to any legislative findings, other than the preamble noted above, or some outside information upon which the Board relied, the evidence indicates that the Village's decision to increase the limitation from four to six seemed to be motivated *predominantly* by concerns about revenue and/or political patronage, not secondary effects and hence, strict scrutiny would apply. And if so, the Ordinance would likely be unconstitutional because the Village's general statements about public welfare would be insufficient to demonstrate that the ordinance was necessary to serve a compelling state interest and narrowly drawn to that end.

Moreover, even if the Village can point to other legislative findings or outside information relied upon by the Board, such that Ordinance 01-27 is subject to the less demanding intermediate level of scrutiny, the Village still must satisfy the fourth prong of the analysis—the regulation must serve a substantial governmental interest, be narrowly tailored,

---

[8] Although the Village nowhere expressly references secondary effects, for the sake of argument, we presume that its interest in the "public health, safety, and welfare" is spurred by a concern over the negative effects which may accompany adult entertainment businesses.

and cannot unreasonably limit alternative avenues of communication. *Id.* at 724. And since a municipality " 'may not assert that it will reduce secondary effects by reducing speech in the same proportion,' " *id.* at 725 (quoting *Alameda Books*, 122 S. Ct. at 1741 (Kennedy, J. concurring)), it is doubtful whether Washington Park will be able to meet this final prong of the analysis, absent some showing that there was no other regulatory means available (aside from the numerical restriction) which would have effectively curbed any deleterious secondary effects of adult entertainment outlets.

In sum, we agree with the district court that based on the limited appellate record, Joelner has a strong likelihood of success on the merits of his permanent injunction and declaratory judgment action as to the facial constitutionality of the numerical restriction. However, our inquiry cannot end here as we must proceed to the balancing of the harms, *see infra* Part II.B., after a brief review of Joelner's other constitutional challenges.[9]

### b.  As Applied

Joelner argues that the Village's application of the numerical restriction was unfounded, arbitrary, and capricious and thus, unconstitutional. As a preliminary matter, we point out that the Board based its rejections of his licenses, at least in part, upon his alleged failure to pay applicable licensing fees. This can hardly be considered an "arbitrary

---

[9]  Joelner also asserts that the ordinance is unconstitutional on its face because it provides no guidelines for the allocation of the limited number of licenses allowed. *See, e.g.*, *City of Lakewood v. Plain Dealer Publ'g Co.*, 486 U.S. 750, 757-58 (1988), *cited in MacDonald*, 132 F.3d at 361 n.6. However, we do not address this issue here because we are fairly convinced that the numerical restriction is otherwise constitutionally flawed.

and capricious" reason for denying Joelner the requested licenses. However, because the record does not reveal what the Board based these allegations upon, how the license applications came to be ordered as they were on the April 15 agenda, or how an application not on the April 15 agenda was considered at all, and particularly how it was considered before Joelner's, we refrain from making any determination with respect to this assertion and leave the issue for a more full examination upon remand.

### 2.  Facial Challenge to the Licensing Fees

The main focus of Joelner's facial challenge to the licensing fees is his argument that Ordinance 01-22 is content-based and therefore unconstitutional. But a statute imposing licensing fees is not "content-based" simply because it is directed at a certain category of activities, such as regulations of parades, rallies, assemblies, and other demonstrations held on city streets or city property. *MacDonald*, 132 F.3d at 361; *Alameda Books*, 535 U.S. at 446. *See, e.g., Church of the Am. Knights of the Klu Klux Klan v. City of Gary*, 334 F.3d 676, 680-81 (7th Cir. 2003) ("*KKK*") (treating regulation affecting only parade and demonstration activities as "content-neutral"); *Forsyth County v. Nationality Movement*, 505 U.S. 123, 130-132 (1992) (same). Rather, an inquiry into the constitutionality of a fee ordinance is two-fold: (1) does the regulation in question vest the public officials in charge of enforcing or applying the ordinance with a constitutionally impermissible amount of discretion, *see, e.g., Forsyth*, 505 U.S. at 130-32; and (2) is the fee amount based upon the costs of administering the ordinance, maintaining public order, and relieving the other burdens on public services stemming from the matter licensed, *see Cox v. New Hampshire*, 312 U.S. 569, 576-77 (1941); *Murdock v. Pennsylvania*, 319 U.S. 105, 116 (1943); *KKK*, 334 F.3d at 682 (citations omitted); *Thomas*, 227 F.3d at 925; *MacDonald*, 132 F.3d at 362-63.

Turning to the first issue, Washington Park vests its public officials with no discretion at all regarding the application of the licensing fee. Every "adult entertainment" venue or proposed venue is subject to Ordinance 01-22, and the license applicant himself, rather than public officials, determines which fee will apply, either by applying for a "bookstore" or a "cabaret" license. *MacDonald*, 132 F.3d at 362. This ordinance does not create the "unbridled discretion" the Supreme Court condemned in *Forsyth*, 505 U.S. at 135-36.

And as to the second issue, we cannot now make any determination regarding the underlying basis for the amount of the fee. Permit or license fees which restrict constitutionally protected speech must bear a rational relationship to the public services involved with the matter licensed. *S.-Suburban Housing Ctr. v. Greater S. Suburban Bd. of Realtors*, 935 F.2d 868, 898 (7th Cir. 1991). The Village generally indicated the basis for the fees in section 1 of Ordinance 01-22:

> [I]t is in the best interests of the health, safety, and welfare of its citizens to increase the license fees for adult entertainment establishments operating within the corporate limits of the Village. After careful consideration of the size of the Village and the number of businesses, the expenses involved in maintaining law and order, the vehicular and pedestrian traffic in the Village, the income and number of problems and difficulties that arise from the aforesaid businesses, and the desire to provide a safer, cleaner, and more aesthetically pleasing Village for its residents, the Board has determined that license fee rates should be increased.

Standing alone these are valid reasons for the imposition of a fee. But the $10,000 and $30,000 fees imposed by Washington Park are certainly not nominal. *See Forsyth*, 505 U.S. 138-40 (dissenting opinion) (discussing whether the

Constitution limits a license fee to a nominal amount). Furthermore, the Village chose to differentiate between "cabarets" and "bookstores." Without more, the statement of purpose included in the statute is insufficient to support the fees, particularly considering the differentiation between establishments and the large cabaret fee. However, the record has not been sufficiently developed for a reliable assessment to be made as to this issue, and thus, the Village will have the opportunity on remand to more adequately demonstrate its justification for these fees. *S.-Suburban Housing Ctr.*, 935 F.2d at 898 (stating the burden is on the municipality to make this "rational relationship" showing).

### B. Balancing of the Harms to the Parties and the Public Interest

Our discussion of Joelner's likelihood of success on the merits generally supports a preliminary injunction to prevent the Village from enforcing the ordinances. Yet our conclusions do not necessitate that outcome. As noted earlier, *see supra* Part II, because this case involves adult entertainment regulations, which implicate conflicting public interests, and because lingering factual questions make a definitive resolution on the merits impossible, the relative harms to the interested parties stemming from a grant or denial of a preliminary injunction must be weighed against the merits. Although we are fairly convinced that there are serious constitutional problems with both the numerical restriction and, to a lesser extent, the licensing fees, a preliminary injunction may nonetheless be inappropriate if the relative harms strongly disfavor such relief. *See, e.g., MacDonald*, 132 F.3d at 363 (vacating a preliminary injunction where the relative harms mediated against it).

### 1. The $30,000 Cabaret Fee and the Numerical Restriction

Regarding the $30,000 fee portion of the ordinance and the numerical restriction, if an injunction were refused, there would be no direct harm to Joelner because he does not have any currently operating licensed cabaret businesses. We also note again our concern about whether Joelner actually owns the relevant properties, *see supra* note 4. Generously, we do acknowledge that Joelner would suffer some opportunity costs if an injunction were refused and these ordinances were later found unconstitutional. But such opportunity costs are too speculative for us to consider here. For example, if we were to enjoin the enforcement of these ordinances, who is to say that Joelner's proposed business would find adequate staff or operate at a profit?

However, if the Village was forced to hold new hearings on Joelner's applications, the Village would incur costs, admittedly nominal. And if the Village was compelled to grant Joelner the licenses he requested, as he urges us to do, the Village would bear the not insignificant increase in police, infrastructural, and other related costs.

Moreover, if the injunction were refused with respect to the $30,000 fee and numerical restriction, Washington Park would still have six currently licensed and operating adult entertainment outlets, including Joelner's bookstore at 2226 Kingshighway. Put differently, there would be no shortage of forums for this type of communication. And as mentioned previously, the opening of each additional outlet may be accompanied by deleterious secondary effects (e.g., increased crime rates, diminished property values, deterioration of neighborhoods, *see, e.g.*, *Renton*, 475 U.S. at 46-47).

In sum, given that there is an abundance of adult entertainment venues in Washington Park, that Joelner does not currently operate any cabaret, and that the Village and the public would bear both direct and indirect costs if even one

additional outlet were opened, despite the constitutional hurdles that must be overcome by each ordinance, a preliminary injunction requiring either new hearings or the issuance of any new licenses to Joelner is on balance disfavored. The district court's order, to the extent it required the Village to conduct a new hearing for Joelner, must be vacated.

### 2. The $10,000 Bookstore Fee

With respect to the $10,000 portion of the fee ordinance, if an injunction were refused and Joelner were forced to pay the fee in order to continue to operate his bookstore, Joelner could suffer significant irreparable harm. It is true that, assuming Joelner ultimately succeeds in establishing the invalidity of the fee provisions, his injury could be compensated through an award of money damages. *MacDonald*, 132 F.3d at 358 n.4. However, $10,000 is a relatively onerous amount to pay to continue operate a business previously licensed for only $100 annually. Second and relatedly, if Joelner cannot afford such a hefty fee, he would be forced to shut down his bookstore. Hence, there is a threat that these allegedly unconstitutionally excessive fees could cause Joelner significant irreparable harm. *See id.* at 363 n.8.

In contrast, if the injunction is granted, allowing Joelner to continue to operate his bookstore without paying the $10,000 fee, the possible harm to the Village is minimal. The Village would be deprived of $10,000—and only temporarily, assuming, *arguendo*, the fee is later found to be constitutional. Even for a small municipality like Washington Park, the harm from such a temporary deprivation of capital cannot outweigh the possible harm to Joelner. Also, Washington Park licensed Joelner's bookstore for only $100 annually from at least 1995 until January 2003, despite the fact that Ordinance 069-99 (enacted September 1999) and Ordinance 01-00 (enacted January 2000) authorized the

Village to impose fees of $3000 and $30,000, respectively.[10] If the Village managed to get along without Joelner's fees for the approximately eight years prior to 2003, surely the Village can survive without these fees for a few more months, while the merits are fully adjudicated. And, as noted earlier, there would be no harm at all to the Village if the fee is later found to be unconstitutional. *Cf. Connection Distrib. Co.*, 154 F.3d at 288 ("[T]he government presumably would be substantially harmed if enforcement of a constitutional law . . . were enjoined[.]").

Regarding the alleged arrearages owed by Joelner, the record does not reveal the Board's basis for these contentions, other than statements by the Village Clerk that Joelner was "in the red." But presumably, although there is no documentation of any objection by the Village to Joelner's payment of only a nominal $100 annual fee prior to January 2003, the Board seeks to hold Joelner responsible for the adult entertainment fees which ostensibly first became applicable in 1999. Given that Joelner's arrearages could possibly total around $56,000[11] and that the Village had made no objection to his "nonpayment" until January 2003, our above analysis with respect to the "new" $10,000 fee likewise applies to the alleged arrearages.

Furthermore, the bookstore is a forum for adult speech known and presumably relied upon by the public. Because

---

[10] We make no explicit or implicit determination regarding the constitutionality of either of these ordinances. The only ordinances challenged in this suit are Nos. 01-22 and 01-27.

[11] Ordinance 069-99, imposing a $3000 annual (or $250/month) adult entertainment license fee, was enacted in September 1999. Ordinance 01-00, imposing a $30,000 annual (or $2500/month) license fee, was enacted in January 2000. Ordinance 01-22, imposing a $10,000 annual adult bookstore fee, was enacted in November 2002. Thus, Joelner's "back-fees" would equal approximately $1000 for September-December 1999 and $55,000 for January 2000-October 2002, for a total of $56,000.

the Village has licensed this business since at least 1995, the Village had, without question, previously determined that the secondary effects of this business were acceptable. Therefore, consideration of the relative harms weighs in favor of granting a preliminary injunction to prevent the Village from collecting the alleged arrearages and enforcing the $10,000 fee provision with respect to Joelner's existing bookstore business. To the extent that the district court's order required payment of these fees to the Village, it should be vacated.

## III. Conclusion

The district court's denial of all injunctive relief requested by Joelner save its order preventing the Village of Washington Park from interfering with the continued operation of Joelner's bookstore located at 2226 Kingshighway was correct and appropriate. But it was error for the district court to require Joelner to pay either the disputed arrearages or the November 2002 fee in order to run this business. In addition, with respect to Joelner's request for new hearings the district court also erred—the Village need not hold any rehearings on any of Joelner's applications, nor grant any new licenses to Joelner.

Therefore, although it appears that the numerical restriction on its face (and possibly as applied to Joelner) is unconstitutional and that the fee requirement on its face may be unconstitutional, after weighing the merits against the interests of Joelner, the Village, and the public, the request to preliminarily enjoin Washington Park from enforcing these ordinances was properly denied, but Joelner should be allowed to continue to operate his bookstore without the payment of any disputed fees pending final disposition of the case. The district court's order is AFFIRMED in part and VACATED in part. The case is REMANDED for further proceedings.

## APPENDIX

**Ordinance 069-99:** Ordinance Limiting the Number of Adult Entertainment Licenses in the Village of Washington Park, St. Clair County, Illinois to the Number of (4) Four.

Be it ordained by the President and Board of Trustees of the Village of Washington Park, Illinois, that there has been and shall be a limitation of the number of adult entertainment licenses to the maximum limit of (4) four as follows:

**Section 1. Limitation and Purpose.**

In order to promote a public interest in the preservation of public health, safety and welfare, and to accord with the historical fact that adult entertainment licenses are and were limited to the number of (4) four, there is and shall be a limitation on the number of adult entertainment licenses and establishments limiting the number of such licenses and establishments to a maximum of (4) four in the Village of Washington Park. This maximum limitation is a reaffirmation of this Village's limitation. The maximum limitation shall apply retrospectively and prospectively. In the event of the cessation of business of any licensed adult entertainment license, the adult entertainment license conferred to the persons or corporation for that establishment shall immediately lapse and no future adult entertainment license shall be issued by any elected or appointed public official, representative, employee, or body of the Village of Washington Park to operate an adult entertainment establishment on the geographic location of a prior existing establishment or any other location within the Village limits of Washington Park, Illinois. Thereupon, the maximum number of adult entertainment licenses shall be immediately lowered to the number of adult entertainment licenses remaining in effect.

**Section 2. License Requirement for Adult Entertainment.**

All persons or corporations involved in the operation of a commercial use featuring [adult entertainment] shall be required to have an adult entertainment license the fee for which is set at $3000.00 and is limited by the number of allowed establishments as set forth herein.

**Section 3. Definition of Adult Entertainment.**

Adult entertainment is the operation of a commercial use featuring acts, performances, videos, and/or movies involving nudity, or partial nudity, but within the permitted community standards of the Village of Washington Park, the County of St. Clair and the State of Illinois, available to persons over the age of (21) twenty-one years.

**Section 4. Transfers Prohibited.**

No entertainment licenses issued by the Village of Washington Park shall be transferable by any means whatsoever, and such authority as an entertainment license confers shall be conferred ONLY to the persons or corporation name thereon.

**Section 5. Authorized Time of Operation.**

In order to promote the health, safety, and welfare of the citizens of Washington Park, Illinois, all adult entertainment licensed establishments are only authorized to conduct adult entertainment on the premises specified, between the time of 6:00 a.m. central time and 12:00 a.m. central time on Sunday through Thursday; and, on Friday through Saturday between 6:00 a.m. central time and 1:00 a.m. central time. Failure to comply with the authorized time of operation shall subject the licensee to immediate re-

vocation of the adult entertainment license by the Village Board. Upon revoking said license, the Village Board shall state the reason(s) in writing to the holder of the revoked license.

Section 6. Saving Clause.

Should any court of competent jurisdiction make a judicial determination that any section, paragraph, provision or sentence of this ordinance is unconstitutional, the validity of the remaining sections, paragraphs, provisions or sentences shall not be affected and shall remain in full force and effect.

**Ordinance 01-00:** Ordinance Amending the Fee for Adult Entertainment License.

Whereas, the president and board of Trustees of the Village of Washington Park, Illinois believe that the public health, safety and welfare of the residents of the Village and those persons who enter the territorial jurisdiction of the Village would be served by an increase in the annual fee for an adult entertainment license within the Village; and,

Whereas, the cost, including police, fire, and other municipal resources to the Village has steadily increased because of the location of said adult entertainment establishments within the Village;

Be it ordained by the president and board of trustees of the Village of Washington Park, Illinois, that the fee for maintaining an adult entertainment license within the Village shall be increased to $30,000.00 [ ] annually.

**Ordinance 01-22:** Amending the License Fees and Other Regulations Regarding Adult Entertainment Licensing.

Be it ordained by the Village of Washington Park as follows:

Section 1. Purpose.

The Village Board has determined that it is in the best interests of the health, safety, and welfare of its citizens to increase the license fees for adult entertainment establishments operating within the corporate limits of the Village. After careful consideration of the size of the Village and the number of businesses, the expenses involved in maintaining law and order, the vehicular and pedestrian traffic in the Village, the income and number of problems and difficulties that arise from the aforesaid businesses, and the desire to provide a safer, cleaner, and more aesthetically pleasing Village for its residents, the Board has determined that license fee rates should be increased.

Section 2. Body of Evidence.

The license fees for engaging in adult entertainment establishments within the Village shall be as provided in the following schedule:

| Business | Fee/Year 2002 | Fee/Year 2003 |
|---|---|---|
| Adult Bookstore | $10,000 | $10,000 |
| Adult Cabaret | $30,000 | $30,000 |

Section 3.

The following definitions apply to all Village of Washington Park regulations.

| *Business* | *Definition* |
|---|---|
| Adult Bookstore | Any business which sells what is commonly known as adult entertainment books, magazines, other reading materials, movies, novelties, or paraphernalia. |
| Adult Cabaret | Any business with adult entertainment which includes live persons performing adult entertainment and which includes nudity. |

Section 4.

The fees contained in Section 2 are annual fees. The businesses may pay the fees on a quarterly basis . . . .

Section 5. Limitation and Purpose.

In order to promote a public interest in the preservation of public health, safety and welfare, and to accord with the historical fact that adult entertainment licenses are and were limited to the number of (4) four, there is and shall be a limitation on the number of adult entertainment licenses and establishments limiting the number of such licenses and establishments to a maximum of (4) four in the Village of Washington Park. This maximum limitation is a reaffirmation of this Village's limitation. The maximum limitation shall apply retrospectively and prospectively. In the event of the cessation of business of any licensed adult entertainment license, the adult entertainment license conferred to the persons or corporation for that establishment shall immediately lapse and no future adult entertainment license shall be issued by any elected or appointed public official, representative, employee, or body of the Village of Washington Park to operate an adult entertainment

establishment on the geographic location of a prior existing establishment or any other location within the Village limits of Washington Park, Illinois. Thereupon, the maximum number of adult entertainment licenses shall be immediately lowered to the number of adult entertainment licenses remaining in effect.

Section 6. Transfers Prohibited.

No entertainment licenses issued by the Village of Washington Park shall be transferable by any means whatsoever, and such authority as an entertainment license confers shall be conferred ONLY to the persons or corporation name thereon.

Section 7. Authorized Time of Operation.

In order to promote the health, safety, and welfare of the citizens of Washington Park, Illinois, all adult entertainment licensed establishments are only authorized to conduct adult entertainment on the premises specified, between the time of 6:00 a.m. central time and 12:00 a.m. central time on Sunday through Thursday; and, on Friday through Saturday between 6:00 a.m. central time and 1:00 a.m. central time. Failure to comply with the authorized time of operation shall subject the licensee to immediate revocation of the adult entertainment license by the Village Board. Upon revoking said license, the Village Board shall state the reason(s) in writing to the holder of the revoked license.

Section 8. Saving Clause.

Should any court of competent jurisdiction make a judicial determination that any section, paragraph, provision or sentence of this ordinance is unconstitutional, the validity

of the remaining sections, paragraphs, provisions or sentences shall not be affected and shall remain in full force and effect.


**Ordinance 01-27:** Amending the Village of Washington Park, Illinois Ordinance No. 01-22, Section 5.

Be it ordained by the Village Board of Trustees of the Village of Washington Park, Illinois in regular meeting assumed as follows:

Section 5. Limitation and Purpose.

In order to promote the public interest in the preservation of public health, safety and welfare, there is and shall be a limitation on the number of adult entertainment licenses and establishments to a maximum of (6) six in the Village of Washington Park. This maximum limitation shall apply prospectively. In the event of cessation of business of any adult entertainment establishment, the adult entertainment license conferred to the persons or corporation for that establishment shall immediately lapse and no future adult entertainment license shall be issued by any elected or appointed public official, representative, employee, or body of the Village of Washington Park to operate an adult entertainment establishment on the geographic location of a prior existing establishment or any other location within the Village limits of Washington Park, Illinois. Thereupon, the maximum number of adult entertainment licenses shall be immediately lowered to the number of adult entertainment licenses remaining in effect.

A true Copy:

Teste:

_____
***Clerk of the United States Court of***
***Appeals for the Seventh Circuit***