SYKES, Circuit Judge.
The dean of Southern Illinois University’s School of Law (“SIU”) revoked the official student organization status of the Christian Legal Society (“CLS”) chapter at SIU because he concluded that CLS’s membership policies, which preclude membership to those who engage in or affirm homosexual conduct, violate SIU’s nondiscrimination policies. CLS sued SIU for violating its First Amendment rights to free speech, expressive association, and free exercise of religion, and its Fourteenth Amendment rights of equal protection and due process. CLS moved for a preliminary injunction, asking that its official student organization status be restored, but the district court denied the motion. We reverse.
I. Background
Southern Illinois University at Carbon-dale and its School of Law, a public university and law school, encourage and support a wide variety of student organizations and invite them to apply for official recognition. The benefits of recognition are several. If an organization is officially recognized by the law school, benefits include access to the law school List-Serve (the law school’s database of e-mail addresses), permission to post information on law school bulletin boards, an appearance on lists of official student organizations in law school publications and on its website, the ability to reserve conference rooms and meeting and storage space, a faculty advisor, and law school money. During the 2004-2005 school year, SIU School of Law recognized seventeen student organizations — among them, the Black Law Student Association, the Federalist Society, the Hispanic Law Student Association, Law School Democrats, Lesbian and Gay Law Students and Supporters, SIU Law School Republicans, the Student Animal Legal Defense Fund, Women’s Law Forum, and CLS. Recognition by the law school does not automatically bestow upon an organization recognition by the larger university, however. For that, organizations must make separate application to SIU; the upside is even more benefits. Groups that register with the university also get university money (it is not clear how much) and access to meeting space at the SIU student center. In June 2005 SIU had 404 registered student organizations.
CLS is a nationwide association of legal professionals and law students who share (broadly speaking) a common faith — Christianity. Members are expected to sub *858 scribe to a statement of faith and agree to live by certain moral principles. One of those principles, the one that has caused the dispute in this case, is that sexual activity outside of a traditional (one man, one woman) marriage is forbidden. That means, in addition to fornication and adultery, CLS disapproves active homosexuality. CLS welcomes anyone to its meetings, but voting members and officers of the organization must subscribe to the statement of faith, meaning, among other things, that they must not engage in or approve of fornication, adultery, or homosexual conduct; or, having done so, must repent of that conduct.
In February 2005 someone complained to SIU about CLS’s membership and leadership requirements that preclude active homosexuals from becoming voting members or officers. SIU informed CLS of the complaint and asked to see a statement of CLS’s membership and leadership policies. CLS obliged. It explained that while “[a]ny student is welcome to participate in CLS chapter meetings and other activities,” voting members and officers must subscribe to certain basic principles and beliefs contained in CLS’s statement of faith, “including the Bible’s prohibition of sexual conduct between persons of the same sex.” CLS also told SIU that a person “who may have engaged in homosexual conduct in the past but has repented of that conduct, or who has homosexual inclinations but does not engage in or affirm homosexual conduct, would not be prevented from serving as an officer or member.”
In response, the law school dean revoked CLS’s registered student organization status, telling CLS that the “tenets of the national CLS” violated two university policies. The first is SIU’s Affirmative Action/Equal Employment Opportunity Policy. In pertinent part, the policy states that SIU will “provide equal employment and education opportunities for all qualified persons without regard to race, color, religion, sex, national origin, age, disability, status as a disabled veteran of the Vietnam era, sexual orientation, or marital status.” The second is a policy of the SIU Board of Trustees which provides that “[n]o student constituency body or recognized student organization shall be authorized unless it adheres to all appropriate federal or state laws concerning nondiscrimination and equal opportunity.” As a result of derecognition, CLS was no longer able to reserve law school rooms for private meetings. CLS could use law school classrooms to meet, but not privately— other students and faculty were free to come and go from the room. CLS also was denied access to law school bulletin boards, representation on the law school’s website or in its publications, and the liberty to refer to itself as the “SIU Chapter of’ the Christian Legal Society. Finally, CLS was stripped of an official faculty advisor, free use of the SIU School of Law auditorium, access to the law school’s List-Serve, and any funds provided to registered student organizations.
CLS brought suit against the dean and several other SIU officials — we will use the shorthand “SIU” to refer to all the defendants' — and quickly moved for a preliminary injunction. CLS claimed that SIU violated CLS’s First Amendment rights of expressive association, free speech, and free exercise of religion. CLS also alleged that it was denied equal protection and due process. On the basis of the record information we have recounted here, the district court denied the motion, holding that CLS’s likelihood of success on the merits was “at best ... a close question.” The district court also held that CLS had not suffered irreparable harm because CLS still existed as an organization, just without the official student organization recognition and benefits con *859 ferred by the university. At most, said the district judge, the harm from derecognition was “speculative.” As the judge saw it, CLS would merely have to “use other meeting areas and other ways to communicate” with students.
CLS appealed and moved for an injunction pending appeal, focusing primarily on its expressive association claim and its right of access to a speaking forum. Granting the injunction pending appeal, we concluded preliminarily that CLS had a reasonable likelihood of success on the merits and that it had shown irreparable harm. The matter was expedited and has now been fully briefed and argued. Our decision has not changed.
II. Discussion
To win a preliminary injunction, a party must show that it is reasonably likely to succeed on the merits, it is suffering irreparable harm that outweighs any harm the nonmoving party will suffer if the injunction is granted, there is no adequate remedy at law, and an injunction would not harm the public interest. Joelner v. Vill. of Wash. Park, 378 F.3d 613, 619 (7th Cir.2004). If the moving party meets this threshold burden, the district court weighs the factors against one another in a sliding scale analysis, id., which is to say the district court must exercise its discretion to determine whether the balance of harms weighs in favor of the moving party or whether the nonmoving party or public interest will be harmed sufficiently that the injunction should be denied.
In a First Amendment case, we are required to make an independent review of the record because “the reaches of the First Amendment are ultimately defined by the facts it is held to embrace,” and the reviewing court must decide independently whether “a given course of conduct falls on the near or far side of the line of constitutional protection.” Hurley v. Irish-American Gay, Lesbian & Bisexual Group of Boston, 515 U.S. 557, 567, 115 S.Ct. 2338, 132 L.Ed.2d 487 (1995); see also Boy Scouts of Am. v. Dale, 530 U.S. 640, 648-49, 120 S.Ct. 2446, 147 L.Ed.2d 554 (2000). On a review of the district court’s denial of a preliminary injunction, legal conclusions are reviewed de novo, findings of historical or evidentiary fact for clear error, and the balancing of the injunction factors for an abuse of discretion. Joelner, 378 F.3d at 620. Our task is simplified here because only the first two injunction factors are disputed. The loss of First Amendment freedoms is presumed to constitute an irreparable injury for which money damages are not adequate, and injunctions protecting First Amendment freedoms are always in the public interest. Id.; see also Elrod v. Burns, 427 U.S. 347, 373, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976) (“The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury.”).
A. Likelihood of Success on the Merits
The district court concluded that because derecognition did not preclude CLS from meeting and expressing itself (it just had to do so without the benefits that official student organization status brings), CLS had not shown a likelihood of success on the merits. We disagree. There are three reasons CLS is reasonably likely to succeed on the merits, and any one of them is enough to carry CLS’s burden. First, it is not clear CLS actually violated any SIU policy, which was the justification offered for revoking its recognized student organization status. Second, CLS has shown a likelihood that SIU impermissibly infringed on CLS’s right of expressive association. Finally, CLS has shown a likelihood that SIU violated CLS’s free speech *860 rights by ejecting it from a speech fornm in which it had a right to remain.[1]
1. Whether CLS Violated a University Policy
As an initial matter, it is doubtful that CLS violated either of the policies SIU cited as grounds for derecognition. One is a Board of Trustees policy providing that “[n]o student constituency body or recognized student organization shall be authorized unless it adheres to all appropriate federal or state laws concerning nondiscrimination and equal opportunity.” Through two rounds of briefing in this Court — one for the injunction pending appeal and one on the merits — SIU failed to identify which federal or state law it believes CLS violated. We pointed out SIU’s shortcoming in our order granting the injunction pending appeal. (Order of Aug. 22, 2005, at 3.) But when invited once again at oral argument to identify a federal or state law CLS had violated, SIU was still unable to answer the question. This raises the specter of pretext; at the least, this asserted ground for derecognition simply drops out of the case.
SIU also claims CLS violated the university’s Affirmative Aetion/EEO policy, which states that SIU will “provide equal employment and education opportunities for all qualified persons without regard to[, among other things,] sexual orientation.” We are skeptical that CLS violated this policy. CLS requires its members and officers to adhere to and conduct themselves in accordance with a belief system regarding standards of sexual conduct, but its membership requirements do not exclude members on the basis of sexual orientation. CLS’s statement of faith specifies, among other things, a belief in the sinfulness of “all acts of sexual conduct outside of God’s design for marriage between one man and one woman, which acts include fornication, adultery, and homosexual conduct.” Those who engage in sexual conduct outside of a traditional marriage are not invited to become CLS members unless they repent the conduct and affirm the statement of faith.
In response to the law school’s inquiry about its membership policies, CLS explained that it interprets its statement of faith to allow persons “who may have homosexual inclinations” to become members of CLS as long as they do not engage in or affirm homosexual conduct. The same is true of unmarried heterosexual persons: heterosexual persons who do not participate in or condone heterosexual conduct outside of marriage may become CLS members; those who engage in unmarried heterosexual conduct and do not repent that conduct and affirm the statement of faith may not. CLS’s membership policies are thus based on belief and behavior rather than status, and no language in SIU’s policy prohibits this.
There are other reasons we are skeptical that CLS violated SIU’s Affirmative Action/EEO policy. First, CLS does not employ anyone. Second, it is not readily apparent (though certainly an argument could be made) that CLS should be consid *861 ered an SIU “education opportunity” for purposes of applying the policy. On this latter point, the Affirmative Action/EEO policy by its terms applies to SIU, and there is no support in the record for the proposition that CLS is an extension of SIU. CLS is a private speaker, albeit one receiving (until it was derecognized) the public benefits associated with recognized student organization status. But subsidized student organizations at public universities are engaged in private speech, not spreading state-endorsed messages. See Rosenberger v. Rector & Visitors of Univ. of Va., 515 U.S. 819, 833-34, 115 S.Ct. 2510, 132 L.Ed.2d 700 (1995) (explaining the difference between government funding of private groups to spread a government-controlled message and government funding of private groups simply to encourage a diversity of views from private speakers); see also Bd. of Regents of Univ. of Wis. Sys. v. Southworth, 529 U.S. 217, 229, 233, 120 S.Ct. 1346, 146 L.Ed.2d 193 (2000). It would be a leap, and one SIU does not take, to suggest that student organizations are mouthpieces for the university.
Accordingly, CLS has demonstrated a likelihood of success on the threshold question of whether either of SIU’s stated grounds for derecognition actually applies. Regardless, even accepting at face value SIU’s conclusion that CLS’s membership policies violated the university’s antidiscrimination policy, CLS has shown a likelihood of success on both its expressive association and free speech claims, and we move to those now.
2. Expressive Association
Implicit in the First Amendment freedoms of speech, assembly, and petition is the freedom to gather together to express ideas — the freedom to associate. Rumsfeld v. Forum for Academic & Institutional Rights, Inc., — U.S.-,-- -, 126 S.Ct. 1297, 1311-12, 164 L.Ed.2d 156 (2006) (“FAIR”); Dale, 530 U.S. at 647-48, 120 S.Ct. 2446; Roberts v. United States Jaycees, 468 U.S. 609, 622, 104 S.Ct. 3244, 82 L.Ed.2d 462 (1984); Healy v. James, 408 U.S. 169, 181, 92 S.Ct. 2338, 33 L.Ed.2d 266 (1972). The freedom to associate assures that the majority (or a powerful or vocal minority) cannot force its views on groups that choose to express unpopular ideas. Dale, 530 U.S. at 647-48, 120 S.Ct. 2446. Government action may impermissibly burden the freedom to associate in a variety of ways; two of them are “imposing] penalties or withold[ing] benefits from individuals because of their membership in a disfavored group” and “inter-fer[ing] with the internal organization or affairs of the group.” Roberts, 468 U.S. at 623, 104 S.Ct. 3244.
The Supreme Court has held that “[t]here can be no clearer example of an intrusion into the internal structure or affairs of an association than a regulation that forces the group to accept members it does not desire.” Id. Freedom to associate “plainly presupposes a freedom not to associate.” Dale, 530 U.S. at 648, 120 S.Ct. 2446 (quoting Roberts, 468 U.S. at 623, 104 S.Ct. 3244). When the government forces a group to accept for membership someone the group does not welcome and the presence of the unwelcome person “affects in a significant way the group’s ability to advocate” its viewpoint, the government has infringed on the group’s freedom of expressive association. Dale, 530 U.S. at 648,120 S.Ct. 2446. However, “the freedom of expressive association, like many freedoms, is not absolute.” Id.; see also Roberts, 468 U.S. at 623, 104 S.Ct. 3244. Infringements on expressive association are subject to strict scrutiny; the right of expressive association “may be overridden ‘by regulations adopted to serve compelling state interests, unrelated to the suppression of ideas, that cannot be *862 achieved through means significantly less restrictive of associational freedoms.’ ” Dale, 530 U.S. at 648, 120 S.Ct. 2446 (quoting Roberts, 468 U.S. at 623, 104 S.Ct. 3244).
Dale and Hurley were “forced inclusion” expressive association cases. The Supreme Court held in Dale that a New Jersey law prohibiting discrimination in public accommodations could not be constitutionally applied to the Boy Scouts to force the Scouts to accept an openly gay scoutmaster. The Court held that the presence of an openly gay scoutmaster “would significantly burden the organization’s right to oppose or disfavor homosexual conduct” and “[t]he state interests embodied in New Jersey’s public accommodations law do not justify such a severe intrusion on the Boy Scouts’ rights to freedom of expressive association.” Dale, 530 U.S. at 659, 120 S.Ct. 2446. Similarly, in Hurley, the Court held that Massachusetts’ public accommodations law could not be constitutionally applied to force a Boston St. Patrick’s Day parade organization to accept a parade unit marching under the banner of an Irish gay and lesbian group. The Court held that “[w]hen the law is applied to expressive activity in the way it was done here, its apparent object is simply to require speakers to modify the content of their expression to whatever extent beneficiaries of the law choose to alter it with a message of their own.” Hurley, 515 U.S. at 578, 115 S.Ct. 2338. This, the Court said, “is a decidedly fatal objective.” Id. at 579, 115 S.Ct. 2338.
CLS alleges that SIU’s application of its antidiscrimination policy as a justification for revocation of CLS’s student organization status unconstitutionally intrudes upon its right of expressive association. The likelihood of success on this claim turns on three questions: (1) Is CLS an expressive association? (2) Would the forced inclusion of active homosexuals significantly affect CLS’s ability to express its disapproval of homosexual activity? and (3) Does CLS’s interest in expressive association outweigh the university’s interest in eradicating discrimination against homosexuals? See Dale, 530 U.S. at 648-59,120 S.Ct. 2446.
It goes without saying that a group must engage in expressive association in order to avail itself of the First Amendment’s protections for expressive association. Id. at 648, 120 S.Ct. 2446. CLS is a group of people bound together by their shared Christian faith and a commitment to “[s]howing the love of Christ to the campus community and the community at large by proclaiming the gospel in word and deed” and “[a]ddressing the question, ‘What does it mean to be a Christian in law?’ ” Members must dedicate themselves to the moral principles embodied in CLS’s statement of faith; one of those principles is affirmance of “certain Biblical standards for sexual morality.” CLS interprets the Bible to prohibit sexual conduct outside of a traditional marriage between one man and one woman. As such, CLS disapproves of fornication, adultery, and homosexual conduct, and believes that participation in or affirmation of such sexual activity is inconsistent with its statement of beliefs. It would be hard to argue — and no one does — that CLS is not an expressive association.
Our next question is whether application of SIU’s antidiscrimination policy to force inclusion of those who engage in or affirm homosexual conduct would significantly affect CLS’s ability to express its disapproval of homosexual activity. Dale, 530 U.S. at 648, 120 S.Ct. 2446. To ask this question is very nearly to answer it. As we have noted, while voting members and officers of CLS must affirm and abide by the standards of sexual conduct contained in its statement of faith, CLS meet *863 ings are open to all. SIU’s enforcement of its antidiscrimination policy upon penalty of derecognition can only be understood as intended to induce CLS to alter its membership standards'—not merely to allow attendance by nonmembers—in order to maintain recognition. There can be little doubt that requiring CLS to make this change would impair its ability to express disapproval of active homosexuality.
CLS is a faith-based organization. One of its beliefs is that sexual conduct outside of a traditional marriage is immoral. It would be difficult for CLS to sincerely and effectively convey a message of disapproval of certain types of conduct if, at the same time, it must accept members who engage in that conduct. CLS’s beliefs about sexual morality are among its defining values; forcing it to accept as members those who engage in or approve of homosexual conduct would cause the group as it currently identifies itself to cease to exist. We have no difficulty concluding that SIU’s application of its nondiscrimination policies in this way burdens CLS’s ability to express its ideas. See Roberts, 468 U.S. at 623, 104 S.Ct. 3244; see also Dale, 530 U.S. at 659, 120 S.Ct. 2446; Hurley, 515 U.S. at 576, 115 S.Ct. 2338 (“[W]hen dissemination of a view contrary to one’s own is forced upon a speaker[,] ... the speaker’s right to autonomy over the message is compromised.”); cf. FAIR, 126 S.Ct. at 1312 (holding that law school’s associational rights are not burdened by law requiring that military recruiters be allowed the same campus access other recruiters are given because military recruiters do not become “members of the school’s expressive association”).
Our final question is this: Does SIU’s interest in preventing discrimination against homosexuals outweigh CLS’s interest in expressing its disapproval of homosexual activity? Dale, 530 U.S. at 658-59, 120 S.Ct. 2446. In order to justify interfering with CLS’s freedom of expressive association, SIU’s policy must serve a compelling state interest that is not related to the suppression of ideas and that cannot be achieved through a less ■ restrictive means. Id. at 648, 120 S.Ct. 2446. Certainly the state has an interest in eliminating discriminatory conduct and providing for equal access to opportunities. See, e.g., Roberts, 468 U.S. at 624, 104 S.Ct. 3244. But the Supreme Court has made it clear that antidiscrimination regulations may not be applied to expressive conduct with the purpose of either suppressing or promoting a particular viewpoint. Dale, 530 U.S. at 659-61, 120 S.Ct. 2446; Hurley, 515 U.S. at 578-79, 115 S.Ct. 2338.
“While the law is free to promote all sorts of conduct in place of harmful behavior, it is not free to interfere with speech for no better reason than promoting an approved message or discouraging a disfavored one, however enlightened either purpose may strike the government.” Hurley, 515 U.S. at 579, 115 S.Ct. 2338; see also Dale, 530 U.S. at 661, 120 S.Ct. 2446. What interest does SIU have in forcing CLS to accept members whose activities violate its creed other than eradicating or neutralizing particular beliefs contained in that creed? SIU has identified none. The only apparent point of applying the policy to an organization like CLS is to induce CLS to modify the content of its expression or suffer the penalty of derecognition.
On the other side of the scale, CLS’s interest in exercising its First Amendment freedoms is unquestionably substantial. “The First Amendment protects expression, be it of the popular variety or not,” Dale, 530 U.S. at 660, 120 S.Ct. 2446, and “public or judicial disapproval of a tenet of an organization’s expression does not justify the State’s effort to compel the organization to accept mem *864 bers where such acceptance would derogate from the organization’s expressive message.” Id. at 661, 120 S.Ct. 2446. CLS has carried its burden of proving a likelihood of success on its claim for violation of its right of expressive association.
SIU objects that this is not a “forced inclusion” case like Dale or Hurley because it is not forcing CLS to do anything at all, but is only withdrawing its student organization status. SIU argues, and the district court held, that the consequences of derecognition are too insignificant to constitute a constitutional violation. The Supreme Court rejected this argument in Healy, a case that parallels this one in all material respects.
Healy involved an expressive association claim by college students who attempted to form a Students for a Democratic Society (“SDS”) chapter at Central Connecticut State College. The college refused to confer official student organization status on the chapter, believing that the organization’s philosophy conflicted with university policy. Healy, 408 U.S. at 174-76, 92 S.Ct. 2338. As a result of nonrecognition, SDS was not allowed to meet on campus or make announcements about meetings and rallies through university channels like newspapers and bulletin boards. Id. at 176, 92 S.Ct. 2338. The court of appeals held the university had not violated SDS’s constitutional right of association because the university had not forced SDS to do anything. Id. at 182, 92 S.Ct. 2338. SDS was still able to meet as a group, but off campus and without the attendant benefits of recognition.
The Supreme Court reversed. The protections of the Constitution, the Court said, are not limited to direct interference with First Amendment freedoms. Id. at 183, 92 S.Ct. 2338. The Constitution also protects against indirect interference. Id. Recalling that “ ‘[t]he vigilant protection of constitutional freedoms is nowhere more vital than in the community of American schools,’ ” id. at 180, 92 S.Ct. 2338 (quoting Shelton v. Tucker, 364 U.S. 479, 487, 81 S.Ct. 247, 5 L.Ed.2d 231 (1960)), the Court held in Healy that SDS’s associational rights had been impermissibly infringed because the school refused to confer student organization status and its attendant benefits on SDS. Id. at 181-84, 92 S.Ct. 2338. Although the Court recognized the university’s interest in maintaining order and enforcing reasonable campus rules, the Court drew a distinction between rules directed at a student organization’s actions and rules directed at its advocacy or philosophy; the former might provide permissible justification for nonrecognition, but the latter do not. Id. at 188-94, 92 S.Ct. 2338.
This case is legally indistinguishable from Healy, and no principled factual distinction appears in the present record that would justify a contrary conclusion. CLS was deprived of the same benefits as the student group in Healy. Both were frozen out of channels of communication offered by their universities; both were denied university money and access to private university facilities for meetings. SDS in Healy, like CLS here, could turn to alternative modes of communication and alternative meeting places, but the Supreme Court held that the student group’s “possible ability to exist outside the campus community does not ameliorate significantly the disabilities imposed by” nonrecognition. Id. at 183, 92 S.Ct. 2338.
The same is true here. SIU may not do indirectly what it is constitutionally prohibited from doing directly. Healy, 408 U.S. at 183, 92 S.Ct. 2338. Read together, the Supreme Court’s holdings in Dale, Hurley, and Healy provide substantial support for CLS’s expressive association claim. CLS has demonstrated a reasonable likelihood of success on its claim for violation of its right of expressive association.
*865 3. Free Speech
The government violates the Free Speech Clause of the First Amendment when it excludes a speaker from a speech forum the speaker is entitled to enter. See Rosenberger, 515 U.S. at 829-30, 115 S.Ct. 2510; Hosty v. Carter, 412 F.3d 731, 737 (7th Cir.2005). SIU has created a speech forum for student organizations and has bestowed certain benefits on those who are qualified to enter the forum. CLS alleges that SIU violated its free speech rights by ejecting it from that speech forum without a compelling reason.
The level of scrutiny applicable to the government’s actions in this type of free speech case differs depending on the nature of forum from which the speaker has been excluded. Good News Club v. Milford Cent. Sch., 533 U.S. 98, 106, 121 S.Ct. 2093, 150 L.Ed.2d 151 (2001); see also Anderson v. Milwaukee County, 433 F.3d 975, 979 (7th Cir.2006). The Supreme Court has identified three different types of speech fora for purposes of First Amendment analysis. In an open or traditional public forum, state restrictions on speech get strict scrutiny. Good News Club, 533 U.S. at 106, 121 S.Ct. 2093; Lamb’s Chapel v. Ctr. Moriches Union Free Sch. Dist., 508 U.S. 384, 391, 113 S.Ct. 2141, 124 L.Ed.2d 352 (1993); Widmar v. Vincent, 454 U.S. 263, 269-79, 102 S.Ct. 269, 70 L.Ed.2d 440 (1981); Hosty, 412 F.3d at 736-37. The government may “exclude a speaker from a traditional public forum ‘only when the exclusion is necessary to serve a compelling state interest and the exclusion is narrowly drawn to achieve that interest.’ ” Ark. Educ. Television Comm’n v. Forbes, 523 U.S. 666, 677, 118 S.Ct. 1633,140 L.Ed.2d 875 (1998) (quoting Cornelius v. NAACP Legal Def. & Educ. Fund., Inc., 473 U.S. 788, 800,105 S.Ct. 3439, 87 L.Ed.2d 567 (1985)). The same standard applies to a “designated public forum,” which is created when the government opens a nontraditional public forum for public discourse. Forbes, 523 U.S. at 677, 118 S.Ct. 1633; DeBoer v. Vill. of Oak Park, 267 F.3d 558, 565-66 (7th Cir.2001).
Finally, a nonpublic forum — public property that “is not by tradition or designation a forum for public communication” — is subject to less rigorous scrutiny than a traditional open or designated public forum. Perry Educ. Ass’n v. Perry Local Educators’ Ass’n, 460 U.S. 37, 46, 103 S.Ct. 948, 74 L.Ed.2d 794 (1983); Good News Club, 533 U.S. at 106, 121 S.Ct. 2093. Speech restrictions in a nonpublic forum must not discriminate on the basis of viewpoint and “must be ‘reasonable in light of the purpose served by the forum.’ ”[2] *866 Good News Club, 533 U.S. at 106-07, 121 S.Ct. 2093 (quoting Cornelius, 473 U.S. at 806, 105 S.Ct. 3439); Forbes, 523 U.S. at 682, 118 S.Ct. 1633; Rosenberger, 515 U.S. at 829, 115 S.Ct. 2510; Lamb’s Chapel, 508 U.S. at 392-93, 113 S.Ct. 2141.
Once the government has set the boundaries of its forum, it may not renege; it must respect its own self-imposed boundaries. Rosenberger, 515 U.S. at 829, 115 S.Ct. 2510; Hosty, 412 F.3d at 737 (noting that when a forum is “declared open to speech ex ante, [participants] may not be censored ex post” when government decides the speech is not welcome). Though recognized student organization status is a forum of the theoretical rather than the physical kind — a street corner or public square is the physical kind — the same rules apply. See Rosenberger, 515 U.S. at 830, 115 S.Ct. 2510.
Whether SIU’s student organization forum is a public, designated public, or nonpublic forum is an inquiry that will require further factual development, and that is a task properly left for the district court. But even assuming at this stage of the litigation that SIU’s student organization forum is a nonpublic forum — making the lowest level of scrutiny applicable — we believe CLS has the better of the argument.
There can be little doubt that SIU’s Affirmative Action/EEO policy is viewpoint neutral on its face, but as the record stands, there is strong evidence that the policy has not been applied in a viewpoint neutral way. According to the present record evidence, CLS is the only student group that has been stripped of its recognized status on the basis that it discriminates on a ground prohibited by SIU’s Affirmative Action/EEO policy. CLS presented evidence that other recognized student organizations discriminate in their membership requirements on grounds prohibited by SIU’s policy. The Muslim Students’ Association, for example, limits membership to Muslims. Similarly, membership in the Adventist Campus Ministries is limited to those “professing the Seventh Day Adventist Faith, and all other students who are interested in studying the Holy Bible and applying its principles.” Membership in the Young Women’s Coalition is for women only, though regardless of their race, color, creed, religion, ethnicity, sexual orientation, or physical ability. There are other examples, but we need not cite them all.
For whatever reason, SIU has applied its antidiscrimination policy to CLS alone, even though other student groups discriminate in their membership requirements on grounds that are prohibited by the policy. SIU contends there is no evidence that other groups would continue to discriminate if threatened with nonrecognition, but that argument is a nonstarter. SIU’s Af *867 firmative Action/EEO policy, which SIU insists applies to all student organizations, is a standing threat of nonrecognition; assuming it applies, that is the whole point of the policy.
Whether the policy is reasonable in light of the purposes the forum serves cannot be determined on this record because we do not know precisely what those purposes are (we could speculate, but that would be inappropriate). We need not reach this aspect of the inquiry, however, given our conclusion that CLS has demonstrated a likelihood of success on its claim that SIU is applying its policy in a viewpoint discriminatory fashion. SIU has singled out CLS for derecognition. The record may be spartan, but every part of it right now points to success for CLS.
B. Balancing of Harms
The district court also held that CLS was not suffering irreparable harm as a result of derecognition, focusing on the fact that CLS could still hold meetings on campus and could communicate with students by means other than university bulletin boards and listservs. The district court believed that CLS was not being forced to include anyone, but was simply being told that if it desires the benefits of recognized student organization status, it must abide by SIU’s antidiscrimination policy. We have already explained the flaws in this analysis; violations of First Amendment rights are presumed to constitute irreparable injuries, Elrod, 421 U.S. at 373, 96 S.Ct. 2673; Joelner, 378 F.3d at 620, and Healy holds that denying official recognition to a student organization is a significant infringement of the right of expressive association. Healy, 408 U.S. at 181, 92 S.Ct. 2338. CLS has shown a reasonable likelihood of success on its expressive association claim under Healy, Dale, and Hurley. CLS has also demonstrated a likelihood of success on its claim that SIU has unconstitutionally excluded it from a speech forum in which it is entitled to remain. . One way or the other, CLS has shown it likely that SIU has violated its First Amendment freedoms.
The district court simply misread the legal standards, and that is necessarily an abuse of discretion. Koon v. United States, 518 U.S. 81, 100, 116 S.Ct. 2035, 135 L.Ed.2d 392 (1996); MacDonald v. Chi. Park Dist., 132 F.3d 355, 357 (7th Cir.1997). The district court did not address the question whether SIU would be harmed by the issuance of a preliminary injunction. On appeal, the only harm SIU claims is the hardship associated with being required to recognize a student organization it believes is violating the university’s antidiscrimination policy. But if SIU is applying that policy in a manner that violates CLS’s First Amendment rights— as CLS has demonstrated is likely — then SIU’s claimed harm is no harm at all.
For the foregoing reasons, we Reverse the district court’s decision and Remand this case with directions to enter a preliminary injunction against SIU.

. There are other claims in this lawsuit, but we do not address them on this appeal because the parties have focused their energies on the expressive association and free speech claims. CLS argues that SIU violated the unconstitutional conditions doctrine by conditioning recognized student organization status on the relinquishment of constitutional rights. In addition, CLS claims SIU violated the Free Exercise Clause of the First Amendment, the Equal Protection Clause of the Fourteenth Amendment (alleging that SIU does not apply its nondiscrimination policies in an evenhanded way), and the Due Process Clause of the Fourteenth Amendment. These claims have not been waived; indeed the parties are free, and as we understand it likely, to pursue them when the case is back in district court.

. The forum nomenclature is not without confusion. Court decisions also speak of “limited public” fora; most recently this phrase has been used interchangeably with “nonpublic” fora, which means both are subject to a lower level of scrutiny. See, e.g., Good News Club v. Milford Cent. Sch., 533 U.S. 98, 106, 121 S.Ct. 2093, 150 L.Ed.2d 151 (2001) (identifying limited public fora as subject to the same test as nonpublic fora described in, for example, Lamb's Chapel v. Ctr. Moriches Union Free Sch. Dist., 508 U.S. 384, 392, 113 S.Ct. 2141, 124 L.Ed.2d 352 (1993)). But “limited public forum” has also been used to describe a subcategory of “designated public forum,” meaning that it would be subject to the strict scrutiny test. See, e.g., R.A.V. v. City of St. Paul, Minn., 505 U.S. 377, 427, 112 S.Ct. 2538, 120 L.Ed.2d 305 (1992) (Stevens, J. concurring); Cornelius v. NAACP Legal Def. & Educ. Fund., Inc., 473 U.S. 788, 796, 105 S.Ct. 3439, 87 L.Ed.2d 567 (1985) (noting that appellate court did not decide whether forum in question was a limited public forum or nonpublic forum); DeBoer v. Vill. of Oak Park, 267 F.3d 558, 566 (7th Cir.2001).
That confusion has infected this litigation. At oral argument both parties described the student organization forum at SIU as a “limited public forum,” but we think they meant different things. CLS noted the diverse array *866 of groups that have recognized student organization status at SIU and maintained that, like those other groups, CLS is entitled to presence in that forum. CLS went on: ''[W]hat the law says is that when a public university sets up such a forum and excludes a group that is otherwise eligible for that forum[,] that it can only do so with reference to a compelling state interest.'1 Given the reference to the strict scrutiny test (compelling state interest), CLS was probably thinking of "limited public forum” as "designated public forum.” See Cornelius, 473 U.S. at 800, 105 S.Ct. 3439 ("[W]hen the government has intentionally designated a place or means of communication as a public forum[,] speakers cannot be excluded without a compelling governmental interest.”). SIU, on the other hand, focuses on the "limited public forum” test articulated by Good News Club: viewpoint neutrality and reasonableness. Accordingly, while the parties appeared to agree at oral argument that we are probably dealing with a "limited public forum,” we will not hold them to that agreement because they were plainly arguing for different levels of scrutiny and the “forum” terminology has not always been clear.