In the

# United States Court of Appeals
## For the Seventh Circuit

No. 05-3239

CHRISTIAN LEGAL SOCIETY, Chapter
at Southern Illinois University School of Law,
a Student Organization at the Southern Illinois
University School of Law on behalf of itself
and its individual members,

*Plaintiff-Appellant,*

*v.*

JAMES E. WALKER, in his official capacity of
President of Southern Illinois University,
PETER C. ALEXANDER, in his official capacity as
Dean of Southern Illinois University School of Law,
JESSICA J. DAVIS, in her official capacity as
Director of Law Student Development, et al.,

*Defendants-Appellees.*

Appeal from the United States District Court
for the Southern District of Illinois.
No. 05 C 4070—**G. Patrick Murphy**, *Chief Judge.*

ARGUED OCTOBER 19, 2005—DECIDED JULY 10, 2006

Before KANNE, WOOD, and SYKES, *Circuit Judges.*

SYKES, *Circuit Judge.* The dean of Southern Illinois
University's School of Law ("SIU") revoked the official
student organization status of the Christian Legal Society

("CLS") chapter at SIU because he concluded that CLS's membership policies, which preclude membership to those who engage in or affirm homosexual conduct, violate SIU's nondiscrimination policies. CLS sued SIU for violating its First Amendment rights to free speech, expressive association, and free exercise of religion, and its Fourteenth Amendment rights of equal protection and due process. CLS moved for a preliminary injunction, asking that its official student organization status be restored, but the district court denied the motion. We reverse.

## I. Background

Southern Illinois University at Carbondale and its School of Law, a public university and law school, encourage and support a wide variety of student organizations and invite them to apply for official recognition. The benefits of recognition are several. If an organization is officially recognized by the law school, benefits include access to the law school List-Serve (the law school's database of e-mail addresses), permission to post information on law school bulletin boards, an appearance on lists of official student organizations in law school publications and on its website, the ability to reserve conference rooms and meeting and storage space, a faculty advisor, and law school money. During the 2004-2005 school year, SIU School of Law recognized seventeen student organizations—among them, the Black Law Student Association, the Federalist Society, the Hispanic Law Student Association, Law School Democrats, Lesbian and Gay Law Students and Supporters, SIU Law School Republicans, the Student Animal Legal Defense Fund, Women's Law Forum, and CLS. Recognition by the law school does not automatically bestow upon an organization recognition by the larger university, however. For that, organizations must make separate application to SIU; the upside is even more benefits. Groups that register with the

university also get university money (it is not clear how much) and access to meeting space at the SIU student center. In June 2005 SIU had 404 registered student organizations.

CLS is a nationwide association of legal professionals and law students who share (broadly speaking) a common faith—Christianity. Members are expected to subscribe to a statement of faith and agree to live by certain moral principles. One of those principles, the one that has caused the dispute in this case, is that sexual activity outside of a traditional (one man, one woman) marriage is forbidden. That means, in addition to fornication and adultery, CLS disapproves active homosexuality. CLS welcomes anyone to its meetings, but voting members and officers of the organization must subscribe to the statement of faith, meaning, among other things, that they must not engage in or approve of fornication, adultery, or homosexual conduct; or, having done so, must repent of that conduct.

In February 2005 someone complained to SIU about CLS's membership and leadership requirements that preclude active homosexuals from becoming voting members or officers. SIU informed CLS of the complaint and asked to see a statement of CLS's membership and leadership policies. CLS obliged. It explained that while "[a]ny student is welcome to participate in CLS chapter meetings and other activities," voting members and officers must subscribe to certain basic principles and beliefs contained in CLS's statement of faith, "including the Bible's prohibition of sexual conduct between persons of the same sex." CLS also told SIU that a person "who may have engaged in homosexual conduct in the past but has repented of that conduct, or who has homosexual inclinations but does not engage in or affirm homosexual conduct, would not be prevented from serving as an officer or member."

In response, the law school dean revoked CLS's registered student organization status, telling CLS that the "tenets of

the national CLS" violated two university policies. The first is SIU's Affirmative Action/Equal Employment Opportunity Policy. In pertinent part, the policy states that SIU will "provide equal employment and education opportunities for all qualified persons without regard to race, color, religion, sex, national origin, age, disability, status as a disabled veteran of the Vietnam era, sexual orientation, or marital status." The second is a policy of the SIU Board of Trustees which provides that "[n]o student constituency body or recognized student organization shall be authorized unless it adheres to all appropriate federal or state laws concerning nondiscrimination and equal opportunity." As a result of derecognition, CLS was no longer able to reserve law school rooms for private meetings. CLS could use law school classrooms to meet, but not privately—other students and faculty were free to come and go from the room. CLS also was denied access to law school bulletin boards, representation on the law school's website or in its publications, and the liberty to refer to itself as the "SIU Chapter of" the Christian Legal Society. Finally, CLS was stripped of an official faculty advisor, free use of the SIU School of Law auditorium, access to the law school's List-Serve, and any funds provided to registered student organizations.

CLS brought suit against the dean and several other SIU officials—we will use the shorthand "SIU" to refer to all the defendants—and quickly moved for a preliminary injunction. CLS claimed that SIU violated CLS's First Amendment rights of expressive association, free speech, and free exercise of religion. CLS also alleged that it was denied equal protection and due process. On the basis of the record information we have recounted here, the district court denied the motion, holding that CLS's likelihood of success on the merits was "at best . . . a close question." The district court also held that CLS had not suffered irreparable harm because CLS still existed as an organization, just without the official student organiza-

tion recognition and benefits conferred by the university. At most, said the district judge, the harm from derecognition was "speculative." As the judge saw it, CLS would merely have to "use other meeting areas and other ways to communicate" with students.

CLS appealed and moved for an injunction pending appeal, focusing primarily on its expressive association claim and its right of access to a speaking forum. Granting the injunction pending appeal, we concluded preliminarily that CLS had a reasonable likelihood of success on the merits and that it had shown irreparable harm. The matter was expedited and has now been fully briefed and argued. Our decision has not changed.

## II. Discussion

To win a preliminary injunction, a party must show that it is reasonably likely to succeed on the merits, it is suffering irreparable harm that outweighs any harm the nonmoving party will suffer if the injunction is granted, there is no adequate remedy at law, and an injunction would not harm the public interest. *Joelner v. Vill. of Wash. Park*, 378 F.3d 613, 619 (7th Cir. 2004). If the moving party meets this threshold burden, the district court weighs the factors against one another in a sliding scale analysis, *id.*, which is to say the district court must exercise its discretion to determine whether the balance of harms weighs in favor of the moving party or whether the nonmoving party or public interest will be harmed sufficiently that the injunction should be denied.

In a First Amendment case, we are required to make an independent review of the record because "the reaches of the First Amendment are ultimately defined by the facts it is held to embrace," and the reviewing court must decide independently whether "a given course of conduct falls on the near or far side of the line of constitutional protection."

*Hurley v. Irish-American Gay, Lesbian & Bisexual Group of Boston*, 515 U.S. 557, 567 (1995); *see also Boy Scouts of Am. v. Dale*, 530 U.S. 640, 648-49 (2000). On a review of the district court's denial of a preliminary injunction, legal conclusions are reviewed de novo, findings of historical or evidentiary fact for clear error, and the balancing of the injunction factors for an abuse of discretion. *Joelner*, 378 F.3d at 620. Our task is simplified here because only the first two injunction factors are disputed. The loss of First Amendment freedoms is presumed to constitute an irreparable injury for which money damages are not adequate, and injunctions protecting First Amendment freedoms are always in the public interest. *Id.*; *see also Elrod v. Burns*, 427 U.S. 347, 373 (1976) ("The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury.").

## A. Likelihood of Success on the Merits

The district court concluded that because derecognition did not preclude CLS from meeting and expressing itself (it just had to do so without the benefits that official student organization status brings), CLS had not shown a likelihood of success on the merits. We disagree. There are three reasons CLS is reasonably likely to succeed on the merits, and any one of them is enough to carry CLS's burden. First, it is not clear CLS actually violated any SIU policy, which was the justification offered for revoking its recognized student organization status. Second, CLS has shown a likelihood that SIU impermissibly infringed on CLS's right of expressive association. Finally, CLS has shown a likelihood that SIU violated CLS's free speech rights by ejecting it from a speech forum in which it had a right to remain.[1]

---

[1] There are other claims in this lawsuit, but we do not address

(continued...)

### 1. Whether CLS Violated a University Policy

As an initial matter, it is doubtful that CLS violated either of the policies SIU cited as grounds for derecognition. One is a Board of Trustees policy providing that "[n]o student constituency body or recognized student organization shall be authorized unless it adheres to all appropriate federal or state laws concerning nondiscrimination and equal opportunity." Through two rounds of briefing in this Court—one for the injunction pending appeal and one on the merits—SIU failed to identify which federal or state law it believes CLS violated. We pointed out SIU's shortcoming in our order granting the injunction pending appeal. (Order of Aug. 22, 2005, at 3.) But when invited once again at oral argument to identify a federal or state law CLS had violated, SIU was still unable to answer the question. This raises the specter of pretext; at the least, this asserted ground for derecognition simply drops out of the case.

SIU also claims CLS violated the university's Affirmative Action/EEO policy, which states that SIU will "provide equal employment and education opportunities for all qualified persons without regard to[, among other things,] sexual orientation." We are skeptical that CLS violated this

---

[1] (...continued)
them on this appeal because the parties have focused their energies on the expressive association and free speech claims. CLS argues that SIU violated the unconstitutional conditions doctrine by conditioning recognized student organization status on the relinquishment of constitutional rights. In addition, CLS claims SIU violated the Free Exercise Clause of the First Amendment, the Equal Protection Clause of the Fourteenth Amendment (alleging that SIU does not apply its nondiscrimination policies in an evenhanded way), and the Due Process Clause of the Fourteenth Amendment. These claims have not been waived; indeed the parties are free, and as we understand it likely, to pursue them when the case is back in district court.

policy. CLS requires its members and officers to adhere to and conduct themselves in accordance with a belief system regarding standards of sexual *conduct,* but its membership requirements do not exclude members on the basis of sexual *orientation.* CLS's statement of faith specifies, among other things, a belief in the sinfulness of "all acts of sexual conduct outside of God's design for marriage between one man and one woman, which acts include fornication, adultery, and homosexual conduct." Those who engage in sexual conduct outside of a traditional marriage are not invited to become CLS members unless they repent the conduct and affirm the statement of faith.

In response to the law school's inquiry about its membership policies, CLS explained that it interprets its statement of faith to allow persons "who may have homosexual inclinations" to become members of CLS as long as they do not engage in or affirm homosexual conduct. The same is true of unmarried heterosexual persons: heterosexual persons who do not participate in or condone heterosexual conduct outside of marriage may become CLS members; those who engage in unmarried heterosexual conduct and do not repent that conduct and affirm the statement of faith may not. CLS's membership policies are thus based on belief and behavior rather than status, and no language in SIU's policy prohibits this.

There are other reasons we are skeptical that CLS violated SIU's Affirmative Action/EEO policy. First, CLS does not employ anyone. Second, it is not readily apparent (though certainly an argument could be made) that CLS should be considered an SIU "education opportunity" for purposes of applying the policy. On this latter point, the Affirmative Action/EEO policy by its terms applies to SIU, and there is no support in the record for the proposition that CLS is an extension of SIU. CLS is a private speaker, albeit one receiving (until it was derecognized) the public benefits associated with recognized student organiza-

tion status. But subsidized student organizations at public universities are engaged in private speech, not spreading state-endorsed messages. *See Rosenberger v. Rector & Visitors of Univ. of Va.,* 515 U.S. 819, 833-34 (1995) (explaining the difference between government funding of private groups to spread a government-controlled message and government funding of private groups simply to encourage a diversity of views from private speakers); *see also Bd. of Regents of Univ. of Wis. Sys. v. Southworth,* 529 U.S. 217, 229, 233 (2000). It would be a leap, and one SIU does not take, to suggest that student organizations are mouthpieces for the university.

Accordingly, CLS has demonstrated a likelihood of success on the threshold question of whether either of SIU's stated grounds for derecognition actually applies. Regardless, even accepting at face value SIU's conclusion that CLS's membership policies violated the university's antidiscrimination policy, CLS has shown a likelihood of success on both its expressive association and free speech claims, and we move to those now.

### 2. Expressive Association

Implicit in the First Amendment freedoms of speech, assembly, and petition is the freedom to gather together to express ideas—the freedom to associate. *Rumsfeld v. Forum for Academic & Institutional Rights, Inc.*, 126 S. Ct. 1297, 1311-12 (2006) ("FAIR"); *Dale*, 530 U.S. at 647-48; *Roberts v. United States Jaycees*, 468 U.S. 609, 622 (1984); *Healy v. James*, 408 U.S. 169, 181 (1972). The freedom to associate assures that the majority (or a powerful or vocal minority) cannot force its views on groups that choose to express unpopular ideas. *Dale*, 530 U.S. at 647-48. Government action may impermissibly burden the freedom to associate in a variety of ways; two of them are "impos[ing] penalties or withold[ing] benefits from individuals because

of their membership in a disfavored group" and "interfer[ing] with the internal organization or affairs of the group." *Roberts*, 468 U.S. at 623.

The Supreme Court has held that "[t]here can be no clearer example of an intrusion into the internal structure or affairs of an association than a regulation that forces the group to accept members it does not desire." *Id.* Freedom to associate "plainly presupposes a freedom not to associate." *Dale*, 530 U.S. at 648 (quoting *Roberts*, 468 U.S. at 623). When the government forces a group to accept for membership someone the group does not welcome and the presence of the unwelcome person "affects in a significant way the group's ability to advocate" its viewpoint, the government has infringed on the group's freedom of expressive association. *Dale*, 530 U.S. at 648. However, "the freedom of expressive association, like many freedoms, is not absolute." *Id.*; *see also Roberts*, 468 U.S. at 623. Infringements on expressive association are subject to strict scrutiny; the right of expressive association "may be overridden 'by regulations adopted to serve compelling state interests, unrelated to the suppression of ideas, that cannot be achieved through means significantly less restrictive of associational freedoms.'" *Dale*, 530 U.S. at 648 (quoting *Roberts*, 468 U.S. at 623).

*Dale* and *Hurley* were "forced inclusion" expressive association cases. The Supreme Court held in *Dale* that a New Jersey law prohibiting discrimination in public accommodations could not be constitutionally applied to the Boy Scouts to force the Scouts to accept an openly gay scoutmaster. The Court held that the presence of an openly gay scoutmaster "would significantly burden the organization's right to oppose or disfavor homosexual conduct" and "[t]he state interests embodied in New Jersey's public accommodations law do not justify such a severe intrusion on the Boy Scouts' rights to freedom of expressive associa-

tion." *Dale*, 530 U.S. at 659. Similarly, in *Hurley*, the Court held that Massachusetts' public accommodations law could not be constitutionally applied to force a Boston St. Patrick's Day parade organization to accept a parade unit marching under the banner of an Irish gay and lesbian group. The Court held that "[w]hen the law is applied to expressive activity in the way it was done here, its apparent object is simply to require speakers to modify the content of their expression to whatever extent beneficiaries of the law choose to alter it with a message of their own." *Hurley*, 515 U.S. at 578. This, the Court said, "is a decidedly fatal objective." *Id.* at 579.

CLS alleges that SIU's application of its anti-discrimination policy as a justification for revocation of CLS's student organization status unconstitutionally intrudes upon its right of expressive association. The likelihood of success on this claim turns on three questions: (1) Is CLS an expressive association? (2) Would the forced inclusion of active homosexuals significantly affect CLS's ability to express its disapproval of homosexual activity? and (3) Does CLS's interest in expressive association outweigh the university's interest in eradicating discrimination against homosexuals? *See Dale*, 530 U.S. at 648-59.

It goes without saying that a group must engage in expressive association in order to avail itself of the First Amendment's protections for expressive association. *Id.* at 648. CLS is a group of people bound together by their shared Christian faith and a commitment to "[s]howing the love of Christ to the campus community and the community at large by proclaiming the gospel in word and deed" and "[a]ddressing the question, 'What does it mean to be a Christian in law?'" Members must dedicate themselves to the moral principles embodied in CLS's statement of faith; one of those principles is affirmance of "certain Biblical standards for sexual morality." CLS interprets the Bible

to prohibit sexual conduct outside of a traditional marriage between one man and one woman. As such, CLS disapproves of fornication, adultery, and homosexual conduct, and believes that participation in or affirmation of such sexual activity is inconsistent with its statement of beliefs. It would be hard to argue—and no one does—that CLS is not an expressive association.

Our next question is whether application of SIU's antidiscrimination policy to force inclusion of those who engage in or affirm homosexual conduct would significantly affect CLS's ability to express its disapproval of homosexual activity. *Dale*, 530 U.S. at 648. To ask this question is very nearly to answer it. As we have noted, while voting members and officers of CLS must affirm and abide by the standards of sexual conduct contained in its statement of faith, CLS meetings are open to all. SIU's enforcement of its antidiscrimination policy upon penalty of derecognition can only be understood as intended to induce CLS to alter its membership standards—not merely to allow attendance by nonmembers—in order to maintain recognition. There can be little doubt that requiring CLS to make this change would impair its ability to express disapproval of active homosexuality.

CLS is a faith-based organization. One of its beliefs is that sexual conduct outside of a traditional marriage is immoral. It would be difficult for CLS to sincerely and effectively convey a message of disapproval of certain types of conduct if, at the same time, it must accept members who engage in that conduct. CLS's beliefs about sexual morality are among its defining values; forcing it to accept as members those who engage in or approve of homosexual conduct would cause the group as it currently identifies itself to cease to exist. We have no difficulty concluding that SIU's application of its nondiscrimination policies in this way burdens CLS's ability to express its ideas. *See Roberts*, 468 U.S. at 623; *see also Dale,* 530 U.S. at 659; *Hurley*, 515

U.S. at 576 ("[W]hen dissemination of a view contrary to one's own is forced upon a speaker[,] . . . the speaker's right to autonomy over the message is compromised."); *cf. FAIR*, 126 S. Ct. at 1312 (holding that law school's associational rights are not burdened by law requiring that military recruiters be allowed the same campus access other recruiters are given because military recruiters do not become "members of the school's expressive association").

Our final question is this: Does SIU's interest in preventing discrimination against homosexuals outweigh CLS's interest in expressing its disapproval of homosexual activity? *Dale*, 530 U.S. at 658-59. In order to justify interfering with CLS's freedom of expressive association, SIU's policy must serve a compelling state interest that is not related to the suppression of ideas and that cannot be achieved through a less restrictive means. *Id.* at 648. Certainly the state has an interest in eliminating discriminatory conduct and providing for equal access to opportunities. *See, e.g.*, *Roberts*, 468 U.S. at 624. But the Supreme Court has made it clear that antidiscrimination regulations may not be applied to expressive conduct with the purpose of either suppressing or promoting a particular viewpoint. *Dale*, 530 U.S. at 659-61; *Hurley*, 515 U.S. at 578-79.

"While the law is free to promote all sorts of conduct in place of harmful behavior, it is not free to interfere with speech for no better reason than promoting an approved message or discouraging a disfavored one, however enlightened either purpose may strike the government." *Hurley*, 515 U.S. at 579; *see also Dale*, 530 U.S. at 661. What interest does SIU have in forcing CLS to accept members whose activities violate its creed other than eradicating or neutralizing particular beliefs contained in that creed? SIU has identified none. The only apparent point of applying the policy to an organization like CLS is to induce CLS to modify the content of its expression or suffer the penalty of derecognition.

On the other side of the scale, CLS's interest in exercising its First Amendment freedoms is unquestionably substantial. "The First Amendment protects expression, be it of the popular variety or not," *Dale*, 530 U.S. at 660, and "public or judicial disapproval of a tenet of an organization's expression does not justify the State's effort to compel the organization to accept members where such acceptance would derogate from the organization's expressive message." *Id.* at 661. CLS has carried its burden of proving a likelihood of success on its claim for violation of its right of expressive association.

SIU objects that this is not a "forced inclusion" case like *Dale* or *Hurley* because it is not forcing CLS to do anything at all, but is only withdrawing its student organization status. SIU argues, and the district court held, that the consequences of derecognition are too insignificant to constitute a constitutional violation. The Supreme Court rejected this argument in *Healy*, a case that parallels this one in all material respects.

*Healy* involved an expressive association claim by college students who attempted to form a Students for a Democratic Society ("SDS") chapter at Central Connecticut State College. The college refused to confer official student organization status on the chapter, believing that the organization's philosophy conflicted with university policy. *Healy*, 408 U.S. at 174-76. As a result of nonrecognition, SDS was not allowed to meet on campus or make announcements about meetings and rallies through university channels like newspapers and bulletin boards. *Id.* at 176. The court of appeals held the university had not violated SDS's constitutional right of association because the university had not forced SDS to do anything. *Id.* at 182. SDS was still able to meet as a group, but off campus and without the attendant benefits of recognition.

The Supreme Court reversed. The protections of the Constitution, the Court said, are not limited to direct

interference with First Amendment freedoms. *Id.* at 183. The Constitution also protects against indirect interference. *Id.* Recalling that "'[t]he vigilant protection of constitutional freedoms is nowhere more vital than in the community of American schools,'" *id.* at 180 (quoting *Shelton v. Tucker*, 364 U.S. 479, 487 (1960)), the Court held in *Healy* that SDS's associational rights had been impermissibly infringed because the school refused to confer student organization status and its attendant benefits on SDS. *Id.* at 181-84. Although the Court recognized the university's interest in maintaining order and enforcing reasonable campus rules, the Court drew a distinction between rules directed at a student organization's actions and rules directed at its advocacy or philosophy; the former might provide permissible justification for nonrecognition, but the latter do not. *Id.* at 188-94.

This case is legally indistinguishable from *Healy*, and no principled factual distinction appears in the present record that would justify a contrary conclusion. CLS was deprived of the same benefits as the student group in *Healy*. Both were frozen out of channels of communication offered by their universities; both were denied university money and access to private university facilities for meetings. SDS in *Healy*, like CLS here, could turn to alternative modes of communication and alternative meeting places, but the Supreme Court held that the student group's "possible ability to exist outside the campus community does not ameliorate significantly the disabilities imposed by" nonrecognition. *Id.* at 183.

The same is true here. SIU may not do indirectly what it is constitutionally prohibited from doing directly. *Healy*, 408 U.S. at 183. Read together, the Supreme Court's holdings in *Dale*, *Hurley*, and *Healy* provide substantial support for CLS's expressive association claim. CLS has demonstrated a reasonable likelihood of success on its claim for violation of its right of expressive association.

### 3. Free Speech

The government violates the Free Speech Clause of the First Amendment when it excludes a speaker from a speech forum the speaker is entitled to enter. *See Rosenberger*, 515 U.S. at 829-30; *Hosty v. Carter*, 412 F.3d 731, 737 (7th Cir. 2005). SIU has created a speech forum for student organizations and has bestowed certain benefits on those who are qualified to enter the forum. CLS alleges that SIU violated its free speech rights by ejecting it from that speech forum without a compelling reason.

The level of scrutiny applicable to the government's actions in this type of free speech case differs depending on the nature of forum from which the speaker has been excluded. *Good News Club v. Milford Cent. Sch.*, 533 U.S. 98, 106 (2001); *see also Anderson v. Milwaukee County*, 433 F.3d 975, 979 (7th Cir. 2006). The Supreme Court has identified three different types of speech fora for purposes of First Amendment analysis. In an open or traditional public forum, state restrictions on speech get strict scrutiny. *Good News Club*, 533 U.S. at 106; *Lamb's Chapel v. Ctr. Moriches Union Free Sch. Dist.*, 508 U.S. 384, 391 (1993); *Widmar v. Vincent*, 454 U.S. 263, 269-79 (1981); *Hosty*, 412 F.3d at 736-37. The government may "exclude a speaker from a traditional public forum 'only when the exclusion is necessary to serve a compelling state interest and the exclusion is narrowly drawn to achieve that interest.'" *Ark. Educ. Television Comm'n v. Forbes*, 523 U.S. 666, 677 (1998) (quoting *Cornelius v. NAACP Legal Def. & Educ. Fund., Inc.*, 473 U.S. 788, 800 (1985)). The same standard applies to a "designated public forum," which is created when the government opens a nontraditional public forum for public discourse. *Forbes*, 523 U.S. at 677; *DeBoer v. Vill. of Oak Park*, 267 F.3d 558, 565-66 (7th Cir. 2001).

Finally, a nonpublic forum—public property that "is not by tradition or designation a forum for public communica-

tion"—is subject to less rigorous scrutiny than a traditional open or designated public forum. *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 46 (1983); *Good News Club*, 533 U.S. at 106. Speech restrictions in a nonpublic forum must not discriminate on the basis of viewpoint and "must be 'reasonable in light of the purpose served by the forum.'"[2] *Good News Club*, 533 U.S. at 106-

---

[2] The forum nomenclature is not without confusion. Court decisions also speak of "limited public" fora; most recently this phrase has been used interchangeably with "nonpublic" fora, which means both are subject to a lower level of scrutiny. *See, e.g.*, *Good News Club v. Milford Cent. Sch.*, 533 U.S. 98, 106 (2001) (identifying limited public fora as subject to the same test as nonpublic fora described in, for example, *Lamb's Chapel v. Ctr. Moriches Union Free Sch. Dist.*, 508 U.S. 384, 392 (1993)). But "limited public forum" has also been used to describe a subcategory of "designated public forum," meaning that it would be subject to the strict scrutiny test. *See, e.g.*, *R.A.V. v. City of St. Paul, Minn.*, 505 U.S. 377, 427 (1992) (Stevens, J. concurring); *Cornelius v. NAACP Legal Def. & Educ. Fund., Inc.*, 473 U.S. 788, 796 (1985) (noting that appellate court did not decide whether forum in question was a limited public forum or nonpublic forum); *DeBoer v. Vill. of Oak Park*, 267 F.3d 558, 566 (7th Cir. 2001).

That confusion has infected this litigation. At oral argument both parties described the student organization forum at SIU as a "limited public forum," but we think they meant different things. CLS noted the diverse array of groups that have recognized student organization status at SIU and maintained that, like those other groups, CLS is entitled to presence in that forum. CLS went on: "[W]hat the law says is that when a public university sets up such a forum and excludes a group that is otherwise eligible for that forum[,] that it can only do so with reference to a compelling state interest." Given the reference to the strict scrutiny test (compelling state interest), CLS was probably thinking of "limited public forum" as "designated public forum." *See Cornelius*, 473 U.S. at 800 ("[W]hen the government has

(continued...)

07 (quoting *Cornelius*, 473 U.S. at 806); *Forbes*, 523 U.S. at 682; *Rosenberger*, 515 U.S. at 829; *Lamb's Chapel*, 508 U.S. at 392-93.

Once the government has set the boundaries of its forum, it may not renege; it must respect its own self-imposed boundaries. *Rosenberger*, 515 U.S. at 829; *Hosty*, 412 F.3d at 737 (noting that when a forum is "declared open to speech *ex ante*, [participants] may not be censored *ex post*" when government decides the speech is not welcome). Though recognized student organization status is a forum of the theoretical rather than the physical kind—a street corner or public square is the physical kind—the same rules apply. *See Rosenberger*, 515 U.S. at 830.

Whether SIU's student organization forum is a public, designated public, or nonpublic forum is an inquiry that will require further factual development, and that is a task properly left for the district court. But even assuming at this stage of the litigation that SIU's student organization forum is a nonpublic forum—making the lowest level of scrutiny applicable—we believe CLS has the better of the argument.

There can be little doubt that SIU's Affirmative Action/EEO policy is viewpoint neutral on its face, but as the record stands, there is strong evidence that the policy has

---

[2]  (...continued)
intentionally designated a place or means of communication as a public forum[,] speakers cannot be excluded without a compelling governmental interest."). SIU, on the other hand, focuses on the "limited public forum" test articulated by *Good News Club*: viewpoint neutrality and reasonableness. Accordingly, while the parties appeared to agree at oral argument that we are probably dealing with a "limited public forum," we will not hold them to that agreement because they were plainly arguing for different levels of scrutiny and the "forum" terminology has not always been clear.

not been applied in a viewpoint neutral way. According to the present record evidence, CLS is the only student group that has been stripped of its recognized status on the basis that it discriminates on a ground prohibited by SIU's Affirmative Action/EEO policy. CLS presented evidence that other recognized student organizations discriminate in their membership requirements on grounds prohibited by SIU's policy. The Muslim Students' Association, for example, limits membership to Muslims. Similarly, membership in the Adventist Campus Ministries is limited to those "professing the Seventh Day Adventist Faith, and all other students who are interested in studying the Holy Bible and applying its principles." Membership in the Young Women's Coalition is for women only, though regardless of their race, color, creed, religion, ethnicity, sexual orientation, or physical ability. There are other examples, but we need not cite them all.

For whatever reason, SIU has applied its antidiscrimination policy to CLS alone, even though other student groups discriminate in their membership requirements on grounds that are prohibited by the policy. SIU contends there is no evidence that other groups would continue to discriminate if threatened with nonrecognition, but that argument is a nonstarter. SIU's Affirmative Action/EEO policy, which SIU insists applies to all student organizations, is a standing threat of nonrecognition; assuming it applies, that is the whole point of the policy.

Whether the policy is reasonable in light of the purposes the forum serves cannot be determined on this record because we do not know precisely what those purposes are (we could speculate, but that would be inappropriate). We need not reach this aspect of the inquiry, however, given our conclusion that CLS has demonstrated a likelihood of success on its claim that SIU is applying its policy in a viewpoint discriminatory fashion. SIU has singled out CLS

for derecognition. The record may be spartan, but every part of it right now points to success for CLS.

**B.  Balancing of Harms**

The district court also held that CLS was not suffering irreparable harm as a result of derecognition, focusing on the fact that CLS could still hold meetings on campus and could communicate with students by means other than university bulletin boards and listservs. The district court believed that CLS was not being forced to include anyone, but was simply being told that if it desires the benefits of recognized student organization status, it must abide by SIU's antidiscrimination policy. We have already explained the flaws in this analysis; violations of First Amendment rights are presumed to constitute irreparable injuries, *Elrod*, 427 U.S. at 373; *Joelner*, 378 F.3d at 620, and *Healy* holds that denying official recognition to a student organization is a significant infringement of the right of expressive association. *Healy*, 408 U.S. at 181. CLS has shown a reasonable likelihood of success on its expressive association claim under *Healy*, *Dale*, and *Hurley*. CLS has also demonstrated a likelihood of success on its claim that SIU has unconstitutionally excluded it from a speech forum in which it is entitled to remain. One way or the other, CLS has shown it likely that SIU has violated its First Amendment freedoms.

The district court simply misread the legal standards, and that is necessarily an abuse of discretion. *Koon v. United States*, 518 U.S. 81, 100 (1996); *MacDonald v. Chi. Park Dist.*, 132 F.3d 355, 357 (7th Cir. 1997). The district court did not address the question whether SIU would be harmed by the issuance of a preliminary injunction. On appeal, the only harm SIU claims is the hardship associated with being required to recognize a student organization it believes is violating the university's antidiscrimination policy. But if

SIU is applying that policy in a manner that violates CLS's First Amendment rights—as CLS has demonstrated is likely—then SIU's claimed harm is no harm at all.

For the foregoing reasons, we REVERSE the district court's decision and REMAND this case with directions to enter a preliminary injunction against SIU.

WOOD, *Circuit Judge,* dissenting. My colleagues have concluded that the district court erred when it refused to grant a preliminary injunction requiring Southern Illinois University School of Law (SIU) in Carbondale to recognize a local chapter of the Christian Legal Society (CLS) as an official student organization. That conclusion is possible, however, only by asking the wrong questions, and thus arriving at the wrong answers. The problem is compounded by the state of the record, which the majority acknowledges is "spartan," *ante* at 20. I would dissolve the temporary injunction that this court issued pending appeal and allow SIU to enforce its nondiscrimination policy while the case proceeds through a full exploration of the merits.

If, in the end, the facts show that the nondiscrimination policy does not apply to student organizations, or that SIU is discriminating against CLS based upon its evangelical Christian viewpoint, the district court should certainly enjoin SIU from enforcing its policy. If on the other hand SIU, as it claims, is merely applying its Affirmative Action/Equal Employment Opportunity Policy (AA/EEO) to an "education opportunity" in a neutral and even-handed manner to religious and nonreligious groups alike, and it is not taking any actions that "force" CLS to accept members

with views that do not comport with CLS's interpretations of the Bible, then SIU is entitled to prevail.

At the outset, it is important to review what is in this record and what is not. With the facts (established and not) in mind, I then turn to the standard of review that this court ought to be applying. Finally, I discuss the important differences between the present case and *Healy v. James,* 408 U.S. 169 (1972)—differences that have a dispositive effect on the way in which the First Amendment rights that CLS is asserting intersect with SIU's own constitutional rights and obligations.

# I

The record contains only a brief description of CLS, other student organizations, and the way that SIU interacts with them. We know only that there is an organization called CLS at SIU; that it is a local chapter of an organization called the Christian Legal Society; that it was a registered student organization at SIU's Law School until March 25, 2005; and that registered student organization status carried with it privileges such as access to space on Law School bulletin boards, private meeting space within the Law School, storage space within the Law School, access to the Law School's website and publications, email access on the Law School's List-Serve, eligibility for certain funding through the Law School, and use of the SIU name. The record also includes the following statement made by CLS:

> CLS interprets its Statement of Faith to require that officers and members adhere to orthodox Christian beliefs, including the Bible's prohibition of sexual conduct between persons of the same sex. A person who engages in homosexual conduct or adheres to the viewpoint that homosexual conduct is not sinful would not be permitted to serve as a CLS chapter officer or member. A person who may have engaged in homosex-

ual conduct in the past but has repented of that con-
duct, or who has homosexual inclinations but does not
engage in or affirm homosexual conduct, would not be
prevented from serving as an officer or member.

Fairly read, this statement reveals that CLS *would* prevent a person who openly affirmed his or her right to engage in homosexual conduct, as part of an intimate relationship with another person, from serving as an officer or member of the organization. Furthermore, Article IV, Section 4.1, of the CLS chapter constitution provides:

Equal Opportunity and Equal Access. In the conduct of all aspects of its activities, the Chapter shall not discriminate on the basis of age, disability, color, national origin, race, sex or veteran status.

Conspicuous by its absence from this list is sexual orientation. The constitution at Section 4.2 also provides that membership "shall be open to all students at the School who agree with the mission and purposes . . . [and] who sign, affirm, and endeavor to live their lives in a manner consistent with the Statement of Faith."

Finally, the record reveals that the Dean of the Law School, Peter C. Alexander, informed CLS that it was in violation of the policy of SIU-Carbondale "to provide equal employment and education opportunities for all qualified persons without regard to race, color, religion, sex, national origin, age, disability, status as a disabled veteran or a veteran of the Vietnam era, sexual orientation, or marital status." (This policy is referred to in the record as the Affirmative Action/Equal Employment Opportunity Policy. While the majority criticizes SIU for failing to state specifically what policy CLS violated, Dean Alexander's letter to CLS makes clear by quoting it that the policy in question is the Affirmative Action/Equal Employment Opportunity Policy. I address this policy in more detail below.) Dean Alexander also said that recognized student organizations

must adhere to "all appropriate federal or state laws concerning nondiscrimination and equal opportunity."

Because of the procedural posture of this case, including the fact that SIU has not yet submitted any evidence, many critical questions remain unexplored. Indeed, some of the supplemental filings this court has received underscore how important these unresolved facts may be. For example, the Center for Law and Religious Freedom, which represents CLS, argues in a letter filed pursuant to Federal Rule of Appellate Procedure 28(j) that CLS does not discriminate "on the basis of 'sexual orientation'" when it insists that its members refrain from "unrepentant sexual conduct outside of traditional marriage," whether that conduct be homosexual or heterosexual. Argument by counsel in a supplemental letter, or even in a brief, is a poor substitute indeed for facts on the ground. When the time comes for permanent relief, solid answers to the following questions, among others, will be essential:

> 1. How has CLS's policy been applied in the past to students who failed to live up to its Biblically-based code of conduct (whether sexually or otherwise)? Has it banned from membership, for example, heterosexual students who have had sexual relations outside marriage? Has it actually admitted any gays who choose not to be sexually active?

> 2. How has the SIU-Carbondale AA/EEO policy been applied in the past? When, if ever, has it been applied to student organizations, as opposed to employees of the University or in classroom situations?

> 3. Does the evidence show that the SIU-Carbondale AA/EEO policy, which the district court found was facially neutral, has been applied neutrally? How are investigations of violations of the policy initiated?

> 4. What are the membership and leadership requirements for other recognized student organizations,

including the Muslim Students' Association, the Adventist Campus Ministries, the Chi Alpha Christian Fellowship, the Young Women's Coalition, the Republicans, the Democrats, and the Lesbian and Gay Law Students and Supporters? Does SIU vet student organizations' constitutions to see if their membership policies are compliant with the AA/EEO policy?

5. Have any other student organizations been denied recognition? If so, under what circumstances? If not, then what justification does SIU-Carbondale have for starting with CLS?

If it turns out that CLS is the only student organization that both (a) espouses views that are inconsistent with the AA/EEO policy and (b) has been denied recognition as a student organization, then there would be reason to fear unlawful discrimination. See *Rosenberger v. Rector & Visitors of Univ. of Va.,* 515 U.S. 819 (1995). If, on the other hand, the other organizations have accommodated their rules and trusted to individual preference to attract the desired participants, we would have a different case. It is virtually impossible to evaluate the Law School's action with respect to CLS without knowing whether it conforms or not to the treatment of similar organizations. CLS has made extensive allegations about these other organizations in its moving papers, but it gives us no reason to think that it has direct knowledge of the internal policies of those organizations. CLS has also included a smattering of constitutions from other groups, but no one from those groups has testified about the accuracy of those documents, nor do we have anything that would tell us anything about the interpretation or application of those constitutions.

**II**

The question remains whether CLS is entitled to a preliminary injunction restoring its status as a recognized

student organization, pending a more complete investiga-
tion of these issues. In order to answer that question, we
must consider both the standard the district court was
obliged to follow in evaluating CLS's request for a prelimi-
nary injunction and the standard of review that this court
applies on appeal. In *Goodman v. Illinois Department
of Financial and Professional Regulation,* 430 F.3d 432 (7th
Cir. 2005), a case in which a chiropractor brought a First
Amendment challenge against a state rule that prohibited
telemarketing of professional medical services, this court
had the following to say about the two relevant standards:

> As the Supreme Court has observed, "[A] preliminary
> injunction is an extraordinary and drastic remedy, one
> that should not be granted unless the movant, *by a
> clear showing,* carries the burden of persuasion."
> *Mazurek v. Armstrong,* 520 U.S. 968, 972 (1997) (quot-
> ing 11A CHARLES ALAN WRIGHT, ARTHUR R. MILLER, &
> MARY KAY KANE, FEDERAL PRACTICE AND PROCEDURE
> § 2948, pp. 129-30 (2d ed. 1995)). To justify this relief,
> movants must show that (1) they have a reasonable
> likelihood of success on the merits; (2) no adequate
> remedy at law exists; (3) they will suffer irreparable
> harm which, absent injunctive relief, outweighs the
> irreparable harm the respondent will suffer if the
> injunction is granted; and (4) the injunction will not
> harm the public interest. *Joelner v. Vill. of Washington
> Park,* 378 F.3d 613, 620 (7th Cir. 2004) (citing *Erickson
> v. Trinity Theatre, Inc.*, 13 F.3d 1061, 1607 [sic] (7th
> Cir. 1994)). A district court's denial of a preliminary
> injunction is reviewed for abuse of discretion. *Ashcroft
> v. Am. Civil Liberties Union,* 542 U.S. 656, 664 (2004)
> [(citations omitted)].

430 F.3d at 437.

The majority acknowledges this well-established law
briefly, *ante* at 5-6, but, citing *Hurley v. Irish-American*

*Gay, Lesbian and Bisexual Group of Boston,* 515 U.S. 557 (1995), it moves quickly to the observation that the reviewing court must make an independent review of the record in cases involving allegations of harm to interests protected by the First Amendment. As *Hurley* makes clear, however, the independent review of which the Court was speaking has to do with the ascertainment of the underlying facts, not the broader standard of review. See *id.* at 567. For example, the reviewing court does not give the normal deference to matters of witness credibility, nor does the usual "clearly erroneous" standard of review cabin the examination of the facts. *Id.* Thus, in *Hurley*, where the parties disagreed whether a parade had the element of expression necessary to implicate the First Amendment, the Court decided this issue for itself. This does not mean that the Court abandoned the abuse of discretion standard of review for appellate courts in cases involving First Amendment rights. If there was any doubt about that, the Court put it to rest in *Ashcroft v. American Civil Liberties Union,* which involved a First Amendment challenge to a statute designed to protect minors from exposure to sexually explicit materials on the internet. 542 U.S. at 659-60. Reviewing a decision by the lower courts to enjoin that statute because it probably violated the First Amendment, the Court wrote:

> This Court, like other appellate courts, has always applied the abuse of discretion standard on review of a preliminary injunction. The grant of appellate jurisdiction under [28 U.S.C.] § 1252 does not give the Court license to depart from established standards of appellate review. If the underlying constitutional question is close, therefore, we should uphold the injunction and remand for trial on the merits. Applying this mode of inquiry, we agree with the Court of Appeals that the District Court did not abuse its discretion in entering the preliminary injunction.

*Id.* at 664-65 (internal quotations and citations omitted).

It is important to note that the existence of a close question logically implies that the district court does not abuse its discretion when it chooses one result over another. A pair of cases in this court in which an alarming pattern of prosecutorial misconduct emerged in criminal trials of high-level drug dealers affiliated with the notorious El Rukn gang illustrates this point well. In *United States v. Boyd,* 55 F.3d 239 (7th Cir. 1995), the district court judge had decided that some of the defendants were entitled to a new trial; applying the abuse of discretion standard to that decision, this court affirmed. See *id.* at 246 ("The issue is judgmental. The responsibility for the exercise of the requisite judgment is the district judge's and we are to intervene only if strongly convinced that he judged wrong. We are not strongly convinced."). Later, in *United States v. Williams,* 81 F.3d 1434 (7th Cir. 1996), another district court judge responsible for a different group of defendants concluded that no new trial was necessary. Once again, this court affirmed, with the following comments:

> Another point that is difficult for nonlawyers to understand or accept is that because the question whether to grant a new trial is committed to the discretion of the district judge, as the defendants rightly concede, it is possible for two judges, confronted with the identical record, to come to opposite conclusions and *for the appellate court to affirm both*. That possibility is implicit in the concept of a discretionary judgment. If the judge could decide only one way he would not be able lawfully to exercise discretion; either he would be following a rule, or the circumstances would be so one-sided that deciding the other way would be an abuse of discretion. If the judge can decide either way because he is within the zone in which he has discretion—can decide either for or against the grant of a new trial—this implies that two judges faced with the identical record could come to opposite conclusions yet both be affirmed.

> When we affirmed Judge (now Chief Judge) Aspen's grant of a new trial to the defendants in the *Boyd* case, we went out of ur way to make clear that we were affirming not because we thought he necessarily was right but because we thought he was reasonable, that he had not "abused his discretion." Because we found no abuse of discretion in his having granted a new trial we had no occasion to decide whether we would also have affirmed him had he denied a new trial or whether, on the contrary, it was one of those one-sided cases where only one ruling is possible. So the fact that Judge Mills on a record very similar, though . . . not identical, to that before Judge Aspen made the opposite ruling does not necessarily require, as a matter of maintaining consistency with our decision in *Boyd*, that we reverse Judge Mills.

*Id.* at 1437-38 (internal citations omitted). Bearing this in mind, the Supreme Court's decision to affirm the issuance of the preliminary injunction in *Ashcroft v. ACLU* in no way suggests that the Court would have reversed had the district court come to the opposite conclusion. The closer the question, the more room there is for the exercise of thoughtful discretion.

### III

With the facts, such as they are, and these standards in mind, all that remains is to consider whether the district court's decision to deny the injunction that CLS requested was an abuse of discretion. The principal reasons why the majority believes that the answer to this question is yes are its conclusions that irreparable harm to CLS must be presumed, that money damages will be inadequate, and that an injunction automatically would be in the public interest. *Ante* at 6. I do not take issue with those propositions in the abstract. Nevertheless, litigants must show

more than these points before they are entitled to a prelimi-
nary injunction. Specifically, they must demonstrate two
more elements: (1) likelihood of success on the merits, and
(2) the irreparable harm that the proponent of the injunc-
tion will suffer without it *outweighs* the irreparable harm
the opponent of the injunction will suffer with it. In my
view, CLS has not satisfied these burdens at this early
stage. I take the two points in turn.

### A. Likelihood of Success on the Merits

The majority offers three reasons for its conclusion that
CLS is likely to succeed on the merits: first, that CLS may
not have violated any SIU policy; second, that SIU may
have infringed impermissibly on CLS's right of expressive
association; and third, that SIU violated CLS's free speech
rights by ejecting it from a speech forum in which it had
a right to remain. *Ante* at 6-7. The record as it now stands,
even interpreted independently, fails to support any of
those assertions.

The policy that applies to SIU's action is the AA/EEO
policy, which promises that SIU will "provide equal employ-
ment *and education opportunities* for all qualified persons
without regard to . . . sexual orientation." Recognized
student organizations play an integral role in the educa-
tional process offered by universities, as the Supreme Court
recognized in *Board of Regents of University of Wisconsin
System v. Southworth,* 529 U.S. 217, 222-23 (2000) (noting
that "[i]n the University's view, the activity fees 'enhance
the educational experience' of its students by 'promot[ing]
extracurricular activities,' 'stimulating advocacy and debate
on diverse points of view,' enabling 'participa[tion] in
political activity,' 'promot[ing] student participa[tion] in
campus administrative activity,' and providing 'opportuni-
ties to develop social skills,' all consistent with the Univer-

sity's mission"). The Court there held that "[t]he University may determine that its mission is well served if students have the means to engage in dynamic discussions of philosophical, religious, scientific, social, and political subjects in their extracurricular campus life outside the lecture hall." *Id.* at 233. *Rosenberger* also involved the extracurricular part of the university experience. 515 U.S. at 824 (noting that "the purpose of the [Student Activities Fund] is to support a broad range of extracurricular student activities that 'are related to the educational purpose of the University'"). SIU was therefore on well-trodden ground when it notified CLS that its AA/EEO policy applied to student organizations that sought official recognition because such recognized student groups provide educational opportunities. Given that SIU's purpose in recognizing student organizations is to provide educational opportunities for its law students, it follows that any recognized organization must follow the rules for the school's "education opportunities." If such an organization (here CLS) discriminates on any basis forbidden by the policy, it is subject to corrective measures. This is enough, in my view, to tip the balance on "likelihood of success on the merits" to SIU's side.

The majority attempts to avoid this conclusion by drawing a distinction between discrimination on the basis of sexual *orientation* and discrimination on the basis of sexual *conduct.* The record contains absolutely no evidence, however, either supporting or refuting the notion that CLS actively bans from membership or leadership positions heterosexual students who may be sexually active outside the boundaries of marriage. Likewise, the record is thoroughly devoid of evidence indicating that a gay or lesbian who has chosen not to be sexually active has been permitted to be a member or leader of CLS. Furthermore, in light of the Supreme Court's recognition in *Lawrence v. Texas,* 539 U.S. 558 (2003), that adult, homosexual, individuals "are

entitled to respect for their private lives," that the "State cannot demean their existence or control their destiny by making their private sexual conduct a crime," and that "[t]heir right to liberty under the Due Process Clause gives them the full right to engage in their conduct without intervention of the government," *id.* at 578, it seems unlikely that a State that wishes to ban both forms of discrimination is forbidden from making this choice. (This is not to say that the State is required to take this step; the military, for example, has not yet done so, and the Supreme Court's decision in *Rumsfeld v. Forum for Academic and Institutional Rights, Inc.,* 126 S.Ct. 1297 (2006) *(FAIR),* indicates that its policy is permissible too.)

Next, the majority worries that SIU's policy infringes on CLS's right of expressive association. But, unlike the rule at issue in *Boy Scouts of America v. Dale,* 530 U.S. 640 (2000), SIU has in no way tried to compel CLS to admit members or to elect officers that offend its precepts. It has said only that CLS must content itself with the benefits and support given to non-recognized student organizations, rather than also receiving the additional perks that go along with recognized status. The Supreme Court has often drawn a line between rules that compel conduct and rules that merely withhold benefits. In the area of abortion, for example, *Planned Parenthood of Southeastern Pennsylvania v. Casey,* 505 U.S. 833, 846 (1992) (plurality), reaffirms the "central holding" of *Roe v. Wade,* 410 U.S. 113 (1973), forbidding the states from banning abortion outright, but as early as 1977, the Court recognized in *Maher v. Roe,* 432 U.S. 464 (1977), that the State was under no obligation to provide affirmative financial support to indigent women who sought abortions. It did so even as it reaffirmed the woman's fundamental right to choose whether or not to terminate her pregnancy. See *id.* at 475 ("There is a basic difference between direct state interference with a protected activity and state encouragement of an alternative activity

consonant with legislative policy."). The same principle applies here: SIU has left CLS entirely free to adopt whatever policies it wants; it has simply declined to give certain additional assistance (financial and in-kind) to organizations that violate its nondiscrimination policy. Nothing SIU has done infringes on CLS's freedom of expressive association, and so this theory cannot support a finding that CLS is likely to succeed on the merits.

In finding otherwise, the majority relies heavily on the Supreme Court's decision in *Healy v. James,* 408 U.S. 169. But a closer look at *Healy* shows instead why SIU's approach to CLS is permissible. In *Healy,* certain students wanted to establish a chapter of the Students for a Democratic Society (SDS), which in the late 1960s and early 1970s was a self-styled "radical" campus group. Central Connecticut State College decided that it did not want SDS anywhere near it. It thus not only refused to confer "recognized" status on the aspiring SDS chapter, it also refused to allow the SDS group to meet on campus, or to make announcements about meetings and rallies through college newspapers and bulletin boards. Still not satisfied, it took the rather extraordinary step of refusing to let the SDS students meet (*i.e.* sit together) in the campus coffee shop! *Id.* at 181. SIU's actions were nothing like this. SIU permitted CLS to have free access to the law school's classrooms for its meetings; it never banned CLS from campus coffee shops or other facilities. Although CLS would need to pay a fee to use the auditorium, its activities as a practical matter were unaffected by that rule, as CLS was a tiny group of six to 12 students. The record says nothing about avenues such as fee waivers or admission charges that might have been available if CLS had wanted to sponsor a large program of general interest to the SIU community. Moreover, the importance that physical campus bulletin boards have today is nothing like the situation in 1972. Most universities and colleges, and most college-aged students, communicate

through email, websites, and hosts like MySpace®. Again, although SIU might not have facilitated CLS's efforts to set up a website and to send emails to other potentially interested students, it did nothing to prohibit CLS from taking advantage of electronic access methods. (If CLS had its own website, any student at the school with access to Google—that is, all of them—could easily have found it.) *Healy*, in short, offers an example of real exclusion from campus; our case presents a counterexample of neutrality toward organizations that do not have formal recognition, but that are otherwise welcome to operate on their own.

Finally, the majority accepts CLS's argument that the University violated its free speech rights by ejecting it from a nonpublic forum without a compelling interest. The majority concedes that the record does not contain enough information to make a definitive decision on the nature of the forum. It suggests that the record contains evidence that SIU has applied its AA/EEO policy in a discriminatory way, *ante* at 19, but the bare texts of a few other alleged constitutions, unverified and without context, are too weak a reed on which to rely. Not a single person from the Muslim Students' Association, or the Adventist Campus Ministries, or the Young Women's Coalition testified, or even provided an affidavit, and so we have no way of knowing whether those organizations were actively discriminating on a prohibited basis. Such evidence, in my view, is critical to the outcome of this case. I agree with the majority that if SIU has somehow singled out CLS for adverse treatment, while tolerating discriminatory practices in violation of its policy for other similarly situated organizations, its position is far more tenuous. The record at this point, however, gives us no reason to think that the University is behaving in such a foolish manner, and I am unwilling to indulge in the presumption that a body that is legally part of the State of Illinois is violating the federal and state constitutions.

B.  Balancing of Harms

The last point relates to the balancing of harms between whatever detriments CLS will suffer if it is denied recognition pending the outcome of this case and the injury that SIU will suffer if it is forced to recognize CLS. CLS undoubtedly has a strong interest in its associational freedom, but, as I have already noted, nothing that SIU is doing directly impedes that freedom, and the indirect effects of SIU's policies are mild. That alone distinguishes this case from *Dale* and *Healy*. Another important difference between our case and *Dale* stems from the fact that CLS is trying to force an affiliation between itself and a state institution. *Dale* was about the prerogative of a private institution to set standards for members and leaders. Here, the State of Illinois, through its universities, has a strong countervailing interest—indeed, in many instances, a compelling constitutional duty—in giving equal treatment to all of its citizens. If CLS wanted to forbid membership to all African-Americans, or to mixed-race wedded couples, or to persons of Arabic heritage, surely SIU would be entitled at a minimum to say that such an organization would have to sustain itself without any state support—even if it could root such a membership policy in a religious text. Furthermore, while the direct impact of CLS's membership policy might be to exclude certain people from that student group, the indirect impact of CLS's recognition of a student group maintaining such a policy is that SIU, intentionally or not, may be seen as tolerating such discrimination. Given that universities have a compelling interest in obtaining diverse student bodies, requiring a university to include exclusionary groups might undermine their ability to attain such diversity. As the Supreme Court noted in *Grutter v. Bollinger,* 539 U.S. 306, 328-29 (2003) (internal citations omitted):

> The Law School's educational judgment that such diversity is essential to its educational mission is one to which we defer. The Law School's assessment that

diversity will, in fact, yield educational benefits is substantiated. . . . Our scrutiny of the interest asserted by the Law School is no less strict for taking into account complex educational judgments in an area that lies primarily within the expertise of the university. Our holding today is in keeping with our tradition of giving a degree of deference to a university's academic decisions, within constitutionally prescribed limits.

We have long recognized that, given the important purpose of public education and the expansive freedoms of speech and thought associated with the university environment, universities occupy a special niche in our constitutional tradition. In announcing the principle of student body diversity as a compelling state interest, Justice Powell invoked our cases recognizing a constitutional dimension, grounded in the First Amendment, of educational autonomy: "The freedom of a university to make its own judgments as to education includes the selection of its student body." . . . Our conclusion that the Law School has a compelling interest in a diverse student body is informed by our view that attaining a diverse student body is at the heart of the Law School's proper institutional mission, and that "good faith" on the part of a university is "presumed" absent "a showing to the contrary."

Thus, even if SIU's AA/EEO policy somehow infringes upon a First Amendment right of CLS or its members, that infringement may be justified if it is in furtherance of a compelling state interest, or, at the least, must be balanced against the harm to SIU from being forced to accept into its expressive association a group that undermines its message of nondiscrimination and diversity. To take away SIU's ability to enforce its nondiscrimination policy may undermine "[t]he freedom of a university to make its own judgments as to education."

Far from undermining this point, the Supreme Court's recent decision in *FAIR,* 126 S.Ct. 1297, underscores the interest of SIU and its Law School in their own speech, and their own associational rights. In *FAIR*, the Court drew a sharp distinction between the speech of outsiders, including the military recruiters whose policy toward gays and lesbians conflicted with that of the law schools, and the speech of members of the community:

> But recruiters are not part of the law school. Recruiters are, by definition, outsiders who come onto campus for the limited purpose of trying to hire students—not to become members of the school's expressive association. This distinction is critical. Unlike the public accommodations law in *Dale,* the Solomon Amendment does not force a law school to accept members it does not desire.

126 S.Ct. at 1312 (internal quotations and citations omitted). Here, CLS is trying to do exactly that: it is trying to force SIU's Law School to accept a "member" (that is, a *recognized* student organization) that SIU does not desire. The whole point of this litigation is to transform CLS from an outsider, like the military recruiters in *FAIR,* into an insider.

In my view, the district court was entitled to conclude that this is a weighty interest on the side of the University. Because CLS has failed to show a likelihood of success on the merits and because it has no fundamental right to the benefits SIU believes should be withheld from it as long as it does not comply with the affirmative action policy, I would find that the district court did not abuse its discretion when it refused to grant the preliminary injunction. I therefore respectfully dissent.

A true Copy:

      Teste:

_____
*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*